# UNITED STATES DISTRICT COURT

**FILED**

for the

Eastern District of California

JUN 2 4 2015

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

| In the Matter of the Search of | ) |
| | ) |
| | ) |
| 1999 FORD MINIVAN, CALIFORNIA LICNSE PLATE NO. 4HGG160, | ) |
| | ) |
| | ) |

Case No. 2:15-SW-0355 KJN

**SEALED**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the          Eastern          District of          California          , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| | Conspiracy to distribute and possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine and a mixture and substance containing a detectable amount of heroin. |
| 21 U.S.C. §§ 846 & 841(a)(1) 21 U.S.C. § 843(b) | Use of a communications facility in furtherance of a drug trafficking offense, namely conspiracy to distribute and possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine and a mixture and substance containing a detectable amount of heroin. |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice          days (give exact ending date if more than 30 days:          ) is requested
- ☐ under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Cindy Yamasaki, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   June 24, 2015

City and state:   Sacramento, California

Judge's signature

Kendall J. Newman, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT FOR CRIMINAL COMPLAINT, ARREST WARRANTS, AND SEARCH WARRANTS

### Defendant and Search Warrant Index

Probable Cause to Charge and Arrest Jose Manuel VALDEZ TORRES and Edgar Eduardo HERRERA ..........9

Probable Cause to Search 2335 Venice Drive, Delano, California (Stash House) ...................................15

Probable Cause to Search 337 Liberty Lane, Delano, California, for Documents Only (California Residence of VALDEZ TORRES).......................................................................................................................18

Probable Cause to Search 9190 Tuolume Drive #29, Sacramento, California (Stash House) ................18

Probable Cause to Charge and Arrest Jason Duane ROGERS and to Search His Residence at 6040 Parkoaks Dr., Citrus Heights, California.........................................................................................................20

Probable Cause to Charge and Arrest BRADLEY GENE WARD and to Search His Residence at 6041 Hilltop Dr., Carmichael, California.....................................................................................................................27

Probable Cause to Charge and Arrest Shannon Anthony ARMSTRONG and to Search His Residence at 555 Encina Dr., El Dorado Hills, California..............................................................................................................30

Probable Cause to Search 4400 Shandwick Drive, #237, Antelop, California (Stash House)..................35

Probable Cause to Charge and Arrest Enrique Alonso VALDEZ YANEZ and William WELCH and to Search WELCH's Residence at 7203 Grady Dr., Citrus Heights, California.............................................................38

Probable Cause to Charge and Arrest Enrique Alonso VALDEZ YANEZ and David UHRIG and to Search UHRIG's Residence at 6742 Kenneth Avenue, Orangevale, California........................................................42

Probable Cause to Charge and Arrest Michael MCGIBBON and to Search His Residence at 7019 Glass Slipper Way, Citrus Heights, California..............................................................................................................45

Probable Cause to Charge and Arrest Leonel VALDEZ AYON for Arranging a June 9th Drug Delivery ........49

Probable Cause to Charge and Arrest Leonel VALDEZ AYON, GOMEZ, and MARTINEZ-CARRANZA ..........51

Probable Cause to Search 220 Avenue Castro, Delano, California (Stash House) ...................................69

I, Cindy Yamasaki, being duly sworn, depose and state as follows:

### AFFIANT'S BACKGROUND AND BASIS OF INFORMATION

1.       I am a Special Agent with the United States Drug Enforcement Administration (DEA) and have been so employed since December 2004. I am currently assigned to the DEA Sacramento District Office Task Force Group. I was assigned to the Clandestine Laboratory Enforcement Team from 2005 to 2009. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code Section 2510(7), and I am empowered by law to conduct investigations and make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.       I was trained as a DEA Special Agent at the DEA/FBI Academy in Quantico, Virginia. During my training I received training in the Controlled Substance Act, Title 21 United States Code, including, but not limited to Sections 841(a)(1) and 846, Controlled Substance Violations and Conspiracy to Commit Controlled Substance Violations. I have received specialized training in narcotic investigation matters including, but not limited to, drug interdiction, drug detection, money laundering techniques and schemes, drug identification, and asset identification and removal. I have also received specialized formal training in clandestine laboratory investigations and safety procedures during a forty hour course at the DEA Academy in Quantico, Virginia. This training involved, but was not limited to, clandestine laboratories, identification of chemicals and other hazardous materials used in the manufacture of methamphetamine, and familiarization with equipment and apparatus used in clandestine laboratory processing.

3.       During the course of my employment as a DEA Special Agent, I have participated in numerous criminal investigations. I have participated in numerous Federal and State search warrants involving the aforementioned listed controlled substances, the seizure of narcotics-related records and other types of evidence that document the activities of criminal organizations in both the manufacturing and distribution of controlled substances. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance, various types of infiltration, including undercover agents, informants, and cooperating sources. Through these

2

investigations, my training and experience, and conversations with other agents and law enforcement personnel, I am familiar with the methods used by drug traffickers to smuggle and safeguard controlled substances, to distribute, manufacture, and transport controlled substances, and to collect and launder related proceeds.

4.      I have also personally participated in no less than six Title III investigations. I was the lead case agent for three investigations and authored Title III affidavits for the interception of over 25 lines. I was also the co-case agent for another investigation and authored the criminal complaints at the conclusion of the investigation. I have participated in all aspects of a Title III investigation, to include wire room supervisor, surveillance leader/participant, and author of affidavits, 10-day reports, etc.

5.      This affidavit is based upon my personal observations, observations of other law enforcement officers, and my review of official police and government reports. I have also consulted with other law enforcement officers involved in the investigation. The investigation has utilized the services of the Drug Enforcement Administration Sacramento District Office (DEA SDO), Central Valley High Intensity Drug Trafficking Area (HIDTA), Sacramento Sheriff's Department (SSD), Kern County Sheriff's Office (KCSO), and the DEA Phoenix Field Division (DEA PFD), Folsom Police Department (FPD), and Citrus Heights Police Department (CHPD). It has also involved Title III intercepts of Target Telephone #1 (661-927-8454), Target Telephone #3 (661-778-8091), Target Telephone #4 (661-667-5167), and Target Telephone #4 (661-667-5280), all of which were utilized by Jose Manuel VALDEZ TORRES. Pursuant to those intercepts, I have reviewed transcripts, call summaries, and/or audio recordings of intercepted telephone calls and text messages to/from Target Telephone #1, Target Telephone #3, Target Telephone #4, and Target Telephone #5. Most of the intercepted conversations were monitored and translated by Spanish-speaking monitors who provided summaries and/or transcripts of the calls/text messages.

6.      Because this affidavit is being submitted to make a showing of probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary and appropriate to establish the foundation for the arrest and search warrants requested herein.

## PURPOSE OF THE AFFIDAVIT

7.      This affidavit is submitted in support of a Criminal Complaint and Arrest Warrants charging the following individuals (collectively, the "Target Subjects") with (1) conspiracy to distribute and possess with intent to distribute controlled substances, to wit, at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, and a mixture or substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21 United States Code Sections 846 & 841(a)(1); and (2) use of a communications facility in furtherance of a drug trafficking offense, namely conspiracy to distribute and possess with intent to distribute controlled substances, to wit, at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, and a mixture or substance containing a detectable amount of heroin, a Schedule I Controlled Substance, as charged herein, in violation of Title 21, United States Code, Section 843(b):

   i.   **Jose Manuel VALDEZ TORRES**, a.k.a. "RUBEN;"

   ii.   **Roberto GOMEZ, Jr.,** a.k.a., "Tito", "Beto;"

   iii.   **Leonel VALDEZ AYON**, a.k.a. "LEON";

   iv.   **Leobardo MARTINEZ-CARRANZA**, a.k.a., "Wacho", "Wachon";

   v.   **Edgar Eduardo HERRERA;**

   vi.   **Enrique Alonso VALDEZ YANEZ;**

   vii.   **Jason Duane ROGERS**, a.k.a., "Yonk/Yonki/Yonke;"

   viii.   **Shannon Anthony ARMSTRONG**, a.k.a., "Venado/Benado;"

   ix.   **Bradley Gene WARD**, a.k.a., "Flaco;"

   x.   **David Andrews UHRIG**, a.k.a., "Casa," "Casa de Piedra;"

   xi.   **William James WELCH**, a.k.a., "Burlington;" and

   xii.   **Michael William McGIBBON**, a.k.a., "Banquita."

8.      With this affidavit, I also request that search warrants be issued for the following locations for the items described in **Attachment B-1:**

   i.   **2335 Venice Drive, Delano, California** (stash house for the VALDEZ TORRES DTO);

4

ii. **9190 Tuolume Drive #29, Sacramento, California** (stash house for the VALDEZ TORRES DTO);

iii. **220 Avenue Castro, Delano, California** (stash house for the VALDEZ TORRES DTO);

iv. **4400 Shandwick Drive #237, Antelope, California** (stash house for the VALDEZ TORRES DTO);

v. **337 Liberty Lane, Delano, California** (the California residence of VALDEZ TORRES);[1]

vi. **6040 Parkoaks Drive, Citrus Heights, California** (the residence of Jason ROGERS);

vii. **555 Encina Drive, El Dorado Hills, California** (the residence of Shannon Anthony ARMSTRONG);

viii. **6041 Hilltop Drive, Carmichael, California** (the residence of Bradley Gene WARD);

ix. **6742 Kenneth Avenue, Orangevale, California** (the residence of David Andrews UHRIG);

x. **7203 Grady Drive, Citrus Heights, California** (the residence of William James WELCH);

xi. **7019 Glass Slipper Way, Citrus Heights, California** (the residence of Michael William McGIBBON); and

xii. All vehicles over which any owner, occupant, or resident of the premises has dominion and control, as determined by agent's observation of such person operating or accessing vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person, specifically including, but not limited to:

---

[1] The undersigned is requesting a document warrant for 337 Liberty Lane, Delano, California (the California residence of VALDEZ TORRES) to search for the items listed in **Attachment B-2**. For all other properties the undersigned is seeking to search for the items listed in **Attachment B-1**.

5

1. A 2004 grey Chrysler minivan, California license plate CA#6JSM020 registered to Carlos J. Valdez, 6430 Verner Ave, Apt 252, Sacramento, CA (driven by GOMEZ to traffic narcotics);

2. A 1996 white Ford Ranger pickup truck, California license plate CA# 09485R1, registered to Carlos Javier Valdez, 2536 Traction Avenue, Apt 3, Sacramento, CA (driven by GOMEZ and an unidentified male known as MARTIN to traffic narcotics);

3. A 2008 dark grey Dodge Durango, California license plate CA#6BAC754, registered to Maria Gonzalez or Arturo Gonzalez, 6455 Villa Drive, Sacramento, CA (driven by GOMEZ to traffic narcotics); and

4. A 1990 red Ford minivan, California license plate CA#4HGG160, registered to Carlos J. Valdez, 2536 Traction Ave, Apt 3, Sacramento, CA (driven by MARTINEZ-CARRANZA and GOMEZ to traffic narcotics).

9.    The facts and information set forth herein are true based upon my personal knowledge and observations, observations of other law enforcement personnel, observations of cooperating individuals as related to me, my review of investigative reports, notes, transcripts, review of intercepted communications, and discussions with other federal, state and local law enforcement officials.  Because this affidavit is submitted for the limited purpose of supporting a Criminal Complaint, arrest warrants, and search warrants, I have not included herein the details of every aspect of the investigation.  I have set forth only the facts that I believe are necessary to establish a foundation for an order authorizing the arrest of the individuals named herein, a criminal complaint charging the individuals named herein, and the search and seizure of the properties identified in this affidavit.  Accordingly, while I have detailed telephone calls and text messages intercepted by law enforcement as part of this investigation, I have not included all drug pertinent telephone calls for each individual, but only as many telephone calls as needed to establish probable cause.

6

**BACKGROUND AND OVERVIEW OF THE INVESTIGATION**

10.    Since December 2013, the DEA Sacramento District Office has been conducting a criminal investigation into a large-scale methamphetamine and heroin trafficking organization led by Jose Manuel VALDEZ TORRES.  This drug trafficking organization (the VALDEZ TORRES DTO) has numerous confederates, including sources-of-supply, drug runner and couriers, and sub-distributors.

11.    Through search warrants for geolocation data and GPS vehicle tracking devices, physical surveillance, confidential source information, phone toll and pen register analysis, and other intelligence, the investigating agencies have learned that the VALDEZ TORRES DTO operates drug trafficking activities in Sacramento, California; Delano, California; and Phoenix, Arizona, and that the VALDEZ TORRES DTO has several sources of supply for heroin and methamphetamine in Mexico and arranges for shipments of drugs on a weekly/bi-weekly basis.  VALDEZ TORRES has retained several drug runners in Sacramento, Delano, and Phoenix, who transport supplies of drugs, collect and transport large sums of drug proceeds, distribute large quantities of drugs to sub-distributors, and maintain locations (known as stash houses) where the drugs and money are stored.

12.    During the course of this investigation, the investigating agencies have sought and obtained court orders authorizing the interception of communications over VALDEZ TORRES' cellular telephones.  On March 13, 2015, the Honorable Troy L. Nunley, United States District Judge for the Eastern District of California, signed an order authorizing the interception of wire communications over (661) 927-8454 ("Target Telephone #1"), which was utilized by VALDEZ TORRES.[2]  *See* 2:15-SW-85-TLN.  Interceptions commenced on March 16, 2015.

13.    On May 7, 2015, the Honorable Troy L. Nunley, United States District Judge for the Eastern District of California, signed an order authorizing the interception of wire and electronic communications over (661) 778-8091 ("Target Telephone #3"), which also was utilized by VALDEZ TORRES.  Interceptions commenced May 8, 2015.

---

[2] Agents sought and obtained authorization to intercept communications over (916) 696-0577 ("Target Telephone #2"), but the device ceased being used before agents began interceptions.  Accordingly, no interceptions ever took place over Target Telephone #2, which was used by VALDEZ YANEZ.

14.     On May 28, 2015, the Honorable Troy L. Nunley, United States District Judge for the Eastern District of California, signed an order authorizing the interception of wire and electronic communications over (661) 667-5167 ("Target Telephone #4) and (661) 667-5280 ("Target Telephone #5), both of which were utilized by VALDEZ TORRES. Interceptions commenced May 29, 2015.

15.     During the course of these Title III wiretaps, agents intercepted VALDEZ TORRES engaging in numerous conversations concerning the transportation of large amounts of heroin and methamphetamine from Mexico to the United States and the delivery of methamphetamine and heroin to individuals in the Eastern District of California. Agents also intercepted VALDEZ TORRES communicating with confederates to made arrangements for the collection and delivery of money relating to the sale of narcotics. VALDEZ TORRES also spoke with numerous Sacramento distributors to arrange for the delivery of a supply of drugs, which were delivered to the distributors by one of VALDEZ TORRES' runners located in Sacramento. Throughout the wiretap investigation, VALDEZ TORRES and his runners used coded language to refer to the names of their sub-distributors and to the quantity and type of drugs being trafficked. Based on wiretap interceptions, the following is a list of nicknames used by members of the VALDEZ TORRES DTO to reference specific sub-distributors located in the Sacramento area:

| Name | Coded Nickname | Translation of Coded Name |
|---|---|---|
| Jason Duane ROGERS | "Yonk", "Yonke", Yonke | Junk |
| Shannon Anthony ARMSTRONG | "Venado", "Benado" | Deer |
| Bradley Gene WARD | "Flaco" | Skinny |
| David Andrews UHRIG | "Casa", "Casa de piedra" | House, house of rock |
| William James WELCH | "Burlington", "store" | Burlington (Coat Factory) store |
| Michael William McGIBBON | "Banquita" | Bench |

## PROBABLE CAUSE AS TO EACH OF THE CHARGED DEFENDANTS

### Probable Cause to Charge and Arrest Jose Manuel VALDEZ TORRES and Edgar Eduardo HERRERA

16.     Agents intercepted calls over the telephone used by VALDEZ TORRES, on March 25-27, 2015, between VALDEZ TORRES, HERRERA, and sources of supply in Mexico (referred to herein as UM1633 and UM6308), in which VALDEZ TORRES directed HERRERA to travel to Southern California to obtain 9 pounds of methamphetamine for the VALDEZ TORRES DTO. The following is a summary of the intercepted conversation which took place in Spanish and was translated by Spanish speaking monitors.

17.     On March 25, 2015, at approximately 9:49AM, Target Telephone #1 sent an outgoing text message to Mexico telephone number 52-667-320-1633, utilized by VALDEZ TORRES' source of supply in Mexico, an unidentified male, known as UM1633. The outgoing text messaged stated, "Tell the lady to stop by today or tomorrow. I'm over here by the lion."

18.     Based on my training and experience, familiarity with this investigation, and previously intercepted telephone calls, I believe that VALDEZ TORRES asked UM1633 to send a supply of drugs to Delano, California. I believe that VALDEZ TORRES was referring to a supply of drugs when using the term "lady" and used the term "lion" to refer to Delano, California

19.     At approximately 10:42AM, Target Telephone #1 placed an outgoing telephone call to UM1633. During the first part of the conversation, VALDEZ TORRES and UM1633 discussed in detail how VALDEZ TORRES had been stopped by law enforcement the previous day.[3] Later in the conversation, VALDEZ TORRES asked UM1633 if UM1633 saw VALDEZ TORRES' message about VALDEZ TORRES meeting up with "la tia" (literal translation: the aunt). UM1633 said that things were fine regarding that. UM1633 said that a "peso" would need to be [unintelligible, or "U/I"], that they (UM1633 et al) would be in that area, and that some things would be over in VALDEZ TORRES' direction. VALDZ TORRES asked if UM1633 was referring to someone going to El Leon (literal translation: the lion). UM1633 asked if VALDEZ TORRES remembered the person who was mentioned when VALDEZ TORRES and UM1633 were with VALDEZ TORRES' Tata. VALDEZ TORRES affirmed. UM1633 said that his buddy would go in

---

[3] Agents confirmed that on March 24, 2015, VALDEZ TORRES was stopped by the California Highway Patrol in Merced, California, on his way back to Delano from Sacramento. He was cited for having tinted front windows.

9

that direction as well. UM1633 said "he" would go in that direction with the girls and told VALDEZ TORRES to be ready there as well.

20.     Based on my training and experience, including my training and experience with this investigation and previous telephone calls involving VALDEZ TORRES, I believe that VALDEZ TORRES asked UM1633 if UM1633 would be sending a supply a drugs ("la tia"). Based on my training, experience, and knowledge of this investigation and coded drug talk, I understand that VALDEZ TORRES was referring to a supply of drugs when he said "la tia." I believe that UM1633 advised VALDEZ TORRES that a supply of drugs ("some things") would be heading to VALDEZ TORRES's location. I believe that VALDEZ TORRES confirmed that UM1633 would be sending the drugs to Delano ("El Leon"). I believe that UM1633 confirmed that one of UM1633's drug couriers would transport a supply of drugs ("girls") to Delano ("in that direction") and that VALDEZ TORRES should be ready to receive the drugs.

21.     At approximately 10:51AM, Target Telephone #1 placed an outgoing call to UM1633. UM1633 stated that he was going to pick up some papers soon. VALDEZ TORRES asked if UM1633's "friend" was going to be with "Tia Angelita". UM1633 said that it seemed that his "friend" was going to head straight to "Leon". VALDEZ TORRES said that was good and told UM1633 to send a message regarding the ride. UM1633 said that the old man asked UM1633 if VALDEZ TORRES could send "some" ahead of time that way "those" could come there as well since "they" would be arriving there anyways. UM1633 told VALDEZ TORRES not to worry about if there wasn't much movement at the moment. UM1633 said that if there was something, then VALDEZ TORRES could give what was supposed to be given and something extra as well. UM1633 then said that something needed to be given to "them" since 30 pieces were going. VALDEZ TORRES acknowledged and asked what the "ride" consisted of. UM1633 said that the ride consisted of 30 girls, and each one was going for a "milpa" (literal translation: plant). VALDEZ TORRES said that he (VALDEZ TORRES) would have what was needed to be given for the ride and if UM1633 wanted things to be squared away, then UM1633 would have to wait a few days. UM1633 stated that he told his buddy to wait as well. VALDEZ TORRES reiterated that he had enough for the "ride" but that UM1633 would have to wait a few days for everything else to be settled. UM1633 said that was fine and that he could send the "lady".

10

UM1633 asked VALDEZ TORRES what number UM1633 would need to tell that lady. VALDEZ
TORRES stated that it was the same as the other day and that he was trying to have a "toston"
(slang for fifty) there. VALDEZ TORRES stated that the guy would need to be given some
anyways. UM1633 said that, God willing, he would have things figured out soon. UM1633 told
VALDEZ TORRES to send a number of who would arrive there. VALDEZ TORRES stated that he
would be "there" the next few days but if it took longer, then VALDEZ TORRES would send
UM1633 another phone number. UM1633 stated that was fine and that he would call "them,"
that way they could call VALDEZ TORRES to come to some type of agreement. VALDEZ TORRES
agreed.

      22.     Based on my training and experience and knowledge of this investigation, I
believe that VALDEZ TORRES asked UM1633 if UM1633's drug courier was going to deliver the
drugs to Los Angeles when asking if UM1633's "friend" was going to be with "Tia Angelita" (Los
Angeles). I believe that UM1633 indicated that the courier ("friend") was going to drive straight
to Delano ("Leon"), possibly from the Mexico/US border. I believe that VALDEZ TORRES then
told UM1633 to text VALDEZ TORRES the telephone number of UM1633's courier, who would
deliver the drugs to Delano. I believe that UM1633 then told VALDEZ TORRES that UM1633's
drug associate ("the old man") wanted VALDEZ TORRES to send back money upon the delivery
of drugs. I believe that UM1633 told VALDEZ TORRES not to worry about sending money for
the drugs if VALDEZ TORRES wasn't about to sell the drugs quickly (wasn't much movement at
the moment). I believe that UM1633 stated that if VALDEZ TORRES did have money to give,
that VALDEZ TORRES could give that money to the courier plus payment to the courier for
transporting/delivering the drugs ("something extra"). I believe that UM1633 told VALDEZ
TORRES that VALDEZ TORRES would have to pay the courier since the courier was bringing 30
units of an unknown type of drug. I believe that UM1633 stated that the couriers would deliver
"30 girls" (possibly 30 pounds of methamphetamine) and that each girl was a "milpa"
($1,000.00). I believe that UM1633 used the term "milpa" to refer to 1,000 because the literal
translation of "mil" is one thousand. I believe that VALDEZ TORRES agreed to pay for the
courier's delivery fee but advised UM1633 that if UM1633 wanted the drug proceeds from the
sale of the 30 girls, then UM1633 would have to wait a few days. I believe that UM1633 agreed

to wait a few days for the drug proceeds and agreed to send the drugs ("girls"). I believe that when he told VALDEZ TORRES to send the number of the one who would arrive there, UM1633 was telling VALDEZ TORRES to give him the phone number of VALDEZ TORRES's runner, who would pick up the supply of drugs. I believe that VALDEZ TORRES indicated that he would be in Delano the next few days but if it took longer than that for the supply to arrive then he would give UM1633 the phone number of his runner.

23.     Between approximately 5:18PM and 7:41PM, Target Telephone #1 exchanged the text messages with Mexico telephone number 52-667-320-1633, utilized by UM1633.[4]

| VALDEZ TORRES (5:18PM): | Bro ask your buddy if the girls will arrive at the Lion by today, because they are needed |
| --- | --- |
| UM1633 (5:18PM): | You said it bro |
| VALDEZ TORRES (7:15PM): | Bro what's the word? |
| UM1633 (7:21PM): | No, well he said he didn't know if today or tomorrow |
| VALDEZ TORRES (7:36PM): | Let me know early, if not, so my buddy can start looking |
| UM1633 (7:37PM): | No bro, yes, everything will be well for tomorrow, god willing |
| VALDEZ TORRES (7:38PM): | That's why bro, tell your buddy to try to be ready by mid day |
| UM1633 (7:40PM): | It's set bro. I will let him know |
| VALDEZ TORRES (7:40PM): | We'll be here |
| UM1633 (7:41PM): | You said it bro. It's done |

24.     Based on my training, experience, and knowledge of this investigation, I believe that VALDEZ TORRES and UM1633 arranged for the supply of drugs ("girls") to arrive in Delano ("Leon") the following day (March 26, 2015). I believe that VALDEZ TORRES asked UM1633 to let VALDEZ TORRES know early so VALDEZ TORRES's runner could be ready to pick up the drugs ("start looking"). I believe that VALDEZ TORRES asked UM1633 to try to have the supply of drugs arrive by midday (on March 26, 2015).

25.     On March 26, 2015, Target Telephone #1 placed an outgoing call to UM1633. UM1633 said "they" would be on their way and that was why he decided to call his buddy. UM1633 stated that his buddy called for an update and that "it" had come in but "they" had stayed with family. VALDEZ TORRES said that "they" were supposed to move some more today.

---

[4] The text messages discussed below have been translated from Spanish to English.

UM1633 stated that he called "him" to get an update since VALDEZ TORRES was waiting. VALDEZ TORRES said that he thought "they" were with Angelita. UM1633 said that "they" were at the entrance and that "he" didn't want to talk on the phone anymore. VALDEZ TORRES said that it wasn't a problem and told UM1633 to take care. UM1633 said that everything was well and that they would be over there sooner or later. UM1633 said that, God willing, he would be with VALDEZ TORRES soon. VALDEZ TORRES acknowledged and said that they would keep each other posted.

26. Based on my training, experience, and knowledge of this investigation, I believe that VALDEZ TORRES contacted UM1633 to find out the status of the pending drug supply (referred to in previous conversations as "la tia"). I believe that UM1633 advised VALDEZ TORRES that UM1633 last heard that the drugs had already been transported across the border (to the United States) the day before ("already over there"). Further, I believe that UM1633 told VALDEZ TORRES that he called his drug associate ("buddy") because he thought that the drugs would be distributed to their intended recipients/drug customers ("on their way"). I believe that UM1633 advised VALDEZ TORRES that the drugs ("it") had crossed the border ("come in") but that the drugs had not yet been distributed ("stayed with family"). I believe that UM1633 stated that more drugs were supposed to be transported ("move some more today") and that UM1633 advised VALDEZ TORRES that he (UM1633) called his drug associate to get an update on the whereabouts of the drugs because he knew VALDEZ TORRES was waiting on the supply of drugs. When VALDEZ TORRES used the term "Angelita", I believe he was referring to the drugs being in Los Angeles. I also believe that UM1633 advised VALDEZ TORRES that UM1633's associate didn't want to talk on the phone because he did not want to engage in conversations related to drug trafficking to avoid detection by law enforcement. I believe that UM1633's associate possibly inferred that he was located at the border when stating that he was at the "entrance". I believe that UM1633 advised VALDEZ TORRES that the drugs would be in Delano ("over there") sooner or later.

27. Between approximately 2:43PM and 4:59PM, VALDEZ TORRES exchanged the following text messages with Mexico telephone number 52-667-333-6308, utilized by an unidentified male (known as "UM6308"):

| UM6308 (2:43PM): | Hello, old man.  We're just here and yourself |
| VALDEZ TORRES (2:44PM): | Good, old man.  How is the Tia?  I want to stop by and greet her |
| UM6308 (2:45PM): | She's around, if you want I can pass you the # |
| VALDEZ TORRES (2:46PM): | Of course, old man.  Send it to me and I'll make sure that she is treated well like always |
| UM6308 (2:55PM): | Okay, that's how it will be.  And right now I will pass you the number |
| VALDEZ TORRES (3:11PM): | Okay, I'll wait |
| VALDEZ TORRES (3:23PM): | Has he arrived, old man? |
| UM6308 (3:25PM): | It's because the friend is getting a new #. He said that he would send it to me when he had a chance. Give me some time, old man. |
| VALDEZ TORRES (3:25PM): | Okay then, I'm going to send my buddy so he can start heading over there |
| UM6308 (3:26PM): | Okay, good |
| UM6308 (4:53PM): | 9096767881 with Ramon, on behalf of Fide |
| VALDEZ TORRES (4:54PM): | Okay, thank you |
| UM6308 (4:55PM): | How much are you going to need so that I can tell Ramon, so that he knows |
| VALDEZ TORRES (4:55PM): | 9 bro |
| UM6308 (4:59PM): | Okay bro |

28.     Based on my training, experience, and knowledge of this investigation, I believe

that UM6308 contacted VALDEZ TORRES to advise VALDEZ TORRES that the supply of drugs was

ready to be delivered.  Previously intercepted conversations with UM6308 indicated that

UM6308 coordinates the shipments of drugs to VALDEZ TORRES after VALDEZ TORRES requests

the shipment of drugs from UM1633.  I further believe that VALDEZ TORRES asked UM6308 if

the shipment of drugs had arrived ("How is the tia?") because VALDEZ TORRES wanted to pick

up the supply ("greet her").  I believe that UM6308 advised VALDEZ TORRES that the supply of

drugs was ready ("she's around") and that UM6308 could give VALDEZ TORRES the phone

number of the individual who would deliver the drugs ("pass you the number").  I believe that it

took some time for UM6308 to give VALDEZ TORRES the phone number of UM6308's courier

14

because the courier changed his phone number. I believe that VALDEZ TORRES advised UM6308 that VALDEZ TORRES was going to send his runner in the direction of where VALDEZ TORRES' runner would meet UM6308's courier. I believe that UM6308 sent VALDEZ TORRES a text message with phone number (909) 676-7881, the phone number of UM6308's courier, who would deliver to the drugs to VALDEZ TORRES's runner. I further believe that VALDEZ TORRES advised UM6308 that he needed 9 units (possibly pounds or kilograms) of an unknown type of drug from Ramon.

### Probable Cause to Search 2335 Venice Drive, Delano, California (Stash House)

29.     At approximately 3:28PM, on March 26, 2015, agents observed a black sedan arrive at 2335 Venice Avenue, Delano, California, and park on the street in front of the residence. Agents observed a Hispanic male (strongly resembling in stature and physical appearance VALDEZ TORRES, and hereinafter referred to as VALDEZ TORRES), exit the vehicle and walk into the garage. Agents also observed via a pole camera targeting the residence a white sedan parked in the driveway of the residence.

30.     At approximately 3:32PM, agents observed VALDEZ TORRES exit the garage and reposition the white sedan into the garage. Agents observed the garage door close shortly thereafter.

31.     At approximately 3:58PM, agents observed VALDEZ TORRES depart the residence in the black sedan alone.

32.     At approximately 3:59PM, Target Telephone #1 placed an outgoing telephone call to telephone number (661) 586-3686 (Subscriber: Arsenio Otanez Lopez, 605 McCrumb St, Shafter, California), believed to be utilized by HERRERA based on the investigation and sequence of events resulting in HERRERA's traffic stop as forth in Paragraphs 33 to 43 below.[5] During the conversation, VALDEZ TORRES told HERRERA to come outside. HERRERA asked VALDEZ TORRES if VALDEZ TORRES was outside. VALDEZ TORRES affirmed.

---

[5] At approximately 12:15AM on March 27, 2015, HERRERA was pulled over by CHP. Inside his vehicle, a white Mercury Cougar sedan, officers located approximately 9 pounds of methamphetamine. HERRERA was subsequently booked by the local authorities. Telephone number (661) 586-3686 was listed in the police booking report as HERRERA's telephone number.

33.     At approximately 4:03PM, agents observed the black sedan arrive back to 2335 Venice Avenue and park in the driveway.  Agents observed VALDEZ TORRES exit the driver's seat and an unidentified male (believed to be HERRERA based on the sequence of events described herein in Paragraphs 34 through 43) wearing a red t-shirt and dark jeans exit the front passenger seat.  Both individuals then walked into the garage.

34.     At approximately 4:16PM, agents observed the white sedan exit the garage driven by an individual wearing a red t-shirt and depart the area.  As the white sedan departed, agents observed VALDEZ TORRES exit the garage, enter the black sedan parked on the driveway, and reposition the black sedan into the garage.

35.     Based on my training, experience, knowledge of this investigation, and intercepted conversations, I believe that VALDEZ TORRES initially drove the white sedan into the garage and closed the garage door in order to prepare the white sedan to travel to Southern California.  I believe that VALDEZ TORRES likely placed a large sum of drug proceeds inside the vehicle, possibly inside a hidden compartment.  Subsequent conversations, as described below, indicated that HERRERA delivered $25,100 of drug proceeds to "Ramon".  I believe that VALDEZ TORRES then departed 2335 Venice Avenue to pick up HERRERA, who was located close by.  I believe that VALDEZ TORRES and HERRERA returned to 2335 Venice Avenue a few minutes later.  I further believe that HERRERA subsequently departed 2335 Venice Avenue in the white sedan – believed to be the Mercury Cougar stopped by CHP later just after midnight on March 27th – and traveled to Southern California to meet "Ramon" to deliver drug proceeds and obtain a supply of methamphetamine.

36.     At approximately 5:09PM, Target Telephone #1 placed an outgoing text message to HERRERA, which stated, "Bro, I put twenty five, one hundred. I had already paid you one thousand. The same ones are going to remain and bring those." Based on my review of this text, my training and experience, and my knowledge of this investigation, I believe that VALDEZ TORRES advised HERRERA that VALDEZ TORRES' runner (HERRERA) was going to deliver $25,100.00 of drug proceeds to UM6308's courier.

37.     At approximately 5:13PM, Target Telephone #1 placed an outgoing text message to HERRERA, "909 676 78 81, with Ramon, on behalf of Fide". Based on my knowledge of this

16

investigation, training, experience, and familiarity with intercepted conversations in this case, I believe that HERRERA is VALDEZ TORRES's drug runner and VALDEZ TORRES instructed HERRERA to contact "Ramon", UM6308's courier, at telephone number (909) 676-7881 and arrange to pick up the supply of drugs. I believe that VALDEZ TORRES instructed HERRERA to tell Ramon that HERRERA was calling on behalf of "Fide".

38.     At approximately 8:28PM, Target Telephone #1 received an incoming call from HERRERA. During the conversation, HERRERA asked VALDEZ TORRES how much it had to be. VALDEZ TORRES asked, which ones? HERRERA said, "the tickets". VALDEZ TORRES said that it had to be 25,100. HERRERA said that it was good.

39.     Based on my training and experience and familiarity with this investigation, I believe that during this call HERRERA confirmed with VALDEZ TORRES how much money he was supposed to give to Ramon and that HERRERA was referring to drug proceeds when using the term "tickets". I believe that VALDEZ TORRES told HERRERA that he was giving Ramon $25,100.00.

40.     At approximately 11:07PM, Target Telephone #1 placed an outgoing text message to HERRERA, which stated, "Where are you?"

41.     At approximately 11:15PM, Target Telephone #1 received an incoming call from HERRERA. During the conversation, HERRERA stated that he was about to get to Gorman. VALDEZ TORRES told HERRERA to go to sleep if HERRERA wanted to. HERRERA said okay. VALDEZ TORRES told HERRERA to check-in in the morning. HERRERA asked what time tomorrow. VALDEZ TORRES said 12.

42.     Based on my training and experience and familiarity with this investigation, I believe that after HERRERA received a text message from VALDEZ TORRES asking HERRERA's his whereabouts, HERRERA contacted VALDEZ TORRES and told him that he was almost to the town of Gorman. I believe that VALDEZ TORRES arranged for HERRERA to contact VALDEZ TORRES the following day at noon.

43.     On March 27, 2015, at approximately 12:15AM, Kern County Sheriff's Department Officer Reed Lovan initiated a lawful traffic stop on a white 1996 Mercury Cougar sedan bearing California license plate #3HKZ630. Pursuant to the traffic stop, Officer Lovan

17

identified Edgar Eduardo HERRERA as the driver and a male juvenile as the passenger. KCSD Officers subsequently located approximately 9 pounds of methamphetamine in the driver's side rear panel behind the speaker. HERRERA was subsequently arrested and booked into the Kern County Jail. HERRERA was charged by state authorities and his charges are pending. HERRERA is currently out of custody on bail. Based on the foregoing and their training and experience, investigating agents believe that the Mercury Cougar stopped by CHP on March 27, 2015, was the white sedan observed entering Valdez Torres's garage earlier in the day on March 26, 2015.

**Probable Cause to Search 337 Liberty Lane, Delano, California, for Documents Only (California Residence of VALDEZ TORRES)**

44.     Intercepted telephone calls and geolocation data indicated that VALDEZ TORRES resided in both the Phoenix, Arizona area and in Delano, California. VALDEZ TORRES traveled frequently between Arizona and California, spending approximately every other week in Arizona and every other week in Delano. Geolocation data for Target Telephone #1 and Target Telephone #4, both used by VALDEZ TORRES, indicated that when VALDEZ TORRES stayed in Delano, he resided at 337 Liberty Lane, Delano, California. Between March 2015 and June 2015, geolocation data indicated that when VALDEZ TORRES was in Delano, California, he was frequently and consistently located at 337 Liberty Lane during the evening hours through the morning and early afternoon The most recent location data indicated that VALDEZ TORRES was located at or near 337 Liberty Lane the night of Thursday, June 18, 2015, and that he stayed overnight and departed on Friday, June 19, 2015.

**Probable Cause to Search 9190 Tuolume Drive #29, Sacramento, California (Stash House)**

45.     On May 16, 2015, VALDEZ TORRES received an incoming call from telephone number (949) 400-2105 (Subscriber: Fernando Garcia), utilized by UM2105. During the conversation, VALDEZ TORRES told UM2105, "The thing is that the guy is going to go tomorrow. He is going to go by and say hi to you tomorrow." VALDEZ TORRES asked UM2105 if UM2105 would be there early, around 9am or 10am the following day. UM2105 said that he would be around at whatever time. UM2105 then stated, "... I was going to ask you... Listen, these ones, I was going to prepare these like the other time, but because they didn't fit for the guy – [voices

18

overlap]... I made them into burritos." VALDEZ TORRES replied, "Okay, make them in burritos or small balls, it doesn't matter." Later in the conversation, VALDEZ TORRES asked, "So that there's ten chairs there?" UM2105 affirmed and VALDEZ TORRES stated that "the lazy guy" would go say hi around 10 the following morning.

46.     Based on my training, experience, and knowledge of this investigation, I believe that VALDEZ TORRES advised UM2105 that VALDEZ TORRES was sending a runner ("the guy") to UM2105 the following day to pick up a supply of drugs ("say hi"). I believe that VALDEZ TORRES indicated that his runner would arrive at/near UM2105's location around 10:00-10:30AM the following morning. I believe that UM2105 then described to VALDEZ TORRES how he packaged the drugs ("made them into burritos"). I believe that UM2105 indicated that the last time UM2105 transferred a supply of drugs to VALDEZ TORRES' runner, they didn't fit inside the compartment in the vehicle ("they didn't fit for the guy"). I believe that VALDEZ TORRES then confirmed that UM2105 would transfer 10 units of drugs ("ten chairs") to VALDEZ TORRES' runner the following morning around 10am.

47.     As part of their ongoing investigation, agents identified telephone number (916) 298-3163 as one of the telephone numbers that most frequently communicated with VALDEZ TORRES. Throughout the course of the wiretap investigation, agents intercepted communications between the user of (916) 298-3163 and VALDEZ TORRES indicating that the user of (916) 298-3163 worked as a drug runner for the VALDEZ TORRES DTO. On May 11, 2015, the investigating agents obtained a court order for geolocation information for phone number (916) 298-3163. *See* 2:15-SW-221-AC (E.D. Cal. 2015). Geolocation data for (916) 298-3163 indicated that late in the evening on May 16, 2015, the person utilizing (916) 298-3163 departed Sacramento and traveled to Bakersfield, California, arriving in the early morning hours of May 17, 2015. The person utilizing (916) 298-3163 was subsequently identified as Roberto GOMEZ, Jr., as described herein. Geolocation data indicated that at approximately 9:00AM, GOMEZ was located in the city of Paramount, California. Geolocation data for (949) 400-2105 indicated that UM2105 lived on Jackson Street in South Gate, California, which is just north of the City of Paramount. Geolocation data indicated that UM2105 was located in South Gate at the time GOMEZ was located in Paramount. Accordingly, I believe that GOMEZ traveled to

19

Southern California (Paramount/South Gate area) to pick up 10 units of an unknown type of drug. I believe that UM2105 possibly sent a runner to deliver the drugs to GOMEZ.

48.    Geolocation data indicated that GOMEZ traveled back to Sacramento on the same day, arriving at approximately 3:00PM, and that GOMEZ may have briefly stopped in Delano, California, on his way back. At approximately 3:15PM, SA Martinez observed a 2004 grey Chrysler minivan, California license plate #6JSM020, driving westbound on Folsom Blvd., towards the Butterfly Garden Apartments located at 9190 Tuolumne Drive, Sacramento, California. At approximately 3:17PM, SA Martinez observed the Chrysler minivan turn into a neighborhood just east of the Butterfly Garden Apartment complex. Several minutes later, SA Martinez observed the Chrysler minivan exit the neighborhood and drive towards the Butterfly Garden Apartment Complex. At approximately 3:22PM, SA Zavala observed a Hispanic male park the grey Chrysler minivan in a parking spot south of apartment #29. SA Zavala observed the Hispanic male, the sole occupant of the vehicle, open the front driver side door and reach between the front driver and passenger seats. At approximately 3:25PM, SA Zavala observed the Hispanic male exit the vehicle carrying a small, grey plastic bag and a large, white shopping bag in his left hand and a set of keys in his right hand. SA Zavala observed the unidentified Hispanic male enter the front door of apartment #29 and positively identified the Hispanic male as Robert GOMEZ, Jr., from Arizona driver's license #D06304108.

49.    Based on the foregoing and my training, experience, and knowledge of this investigation, I believe that on May 17, 2015, GOMEZ traveled to Southern California to obtain a supply of drugs. I believe that GOMEZ immediately traveled to 9190 Tuolumne Drive #29, Sacramento, California, to store the supply of drugs.

**Probable Cause to Charge and Arrest Jason Duane ROGERS and to Search His Residence at 6040 Parkoaks Dr., Citrus Heights, California**

### ROGERS Receives 6 Ounces of Heroin and Two Ounces of Methamphetamine on May 30, 2015

50.    ROGERS is VALDEZ TORRES' largest sub-distributor of heroin in the Sacramento area and contacts VALDEZ TORRES on an almost daily basis to obtain supplies of both heroin

20

and methamphetamine. Agents have intercepted ROGERS' communications with VALDEZ
TORRES regularly since March 2015. For example, on May 30, 2015, intercepted conversations
and surveillance indicated that VALDEZ TORRES instructed his drug runner, GOMEZ, to deliver
heroin and methamphetamine to ROGERS several times on the same day. At approximately
11:33AM, VALDEZ TORRES received an incoming call on Target Telephone #5 from telephone
number (916) 202-2825, utilized by ROGERS. ROGERS said he needed "3 of the black tires" and
VALDEZ TORRES said he would see if his "friend" was around. ROGERS stated that he would
probably call one more time this afternoon.

     51.    Based on my training, experience, and knowledge of this investigation, and
understanding of coded drug talk, I believe that during the foregoing conversation ROGERS
told VALDEZ TORRES that he needed 3 ounces of heroin when stating that he needed 3 of the
black tires. I further believe that VALDEZ TORRES told ROGERS that he would see if his runner
("friend") was available to deliver the drugs and that ROGERS advised VALDEZ TORRES that he
would probably need an additional amount of drugs later that afternoon when stating that he
was going to call again.

     52.    At approximately 11:39AM, VALDEZ TORRES used Target Telephone #4 to text
his Sacramento drug runner, Roberto GOMEZ. The text message stated, "Yonki. 3 del."
GOMEZ immediately texted VALDEZ TORRES, "Ok".

     53.    Based on my training, experience, and knowledge of this investigation, I believe
that with the foregoing text message VALDEZ TORRES instructed GOMEZ to deliver 3 ounces of
heroin to ROGERS. Specifically, I believe that VALDEZ TORRES refers to ROGERS as "Yonk"
(translation: junk) because ROGERS appears to have a lot of junk and old cars at his residence,
located at 6040 Parkoaks Drive, Citrus Heights, California. I also believe that VALDEZ TORRES
uses the term "del" (meaning "of the") to refer to heroin.

     54.    At approximately 12:48PM, VALDEZ TORRES received an incoming text message
from GOMEZ which stated, "It's done". Historically, during this investigation, intercepted
telephone conversations over Target Telephone #1 and Target Telephone #4 indicated that
after VALDEZ TORRES' runners complete a drug delivery, they typically send a text message to
VALDEZ TORRES which says, "Listo" (translation: It's done) or call VALDEZ TORRES to tell him

that they completed the delivery. Accordingly, I believe that after GOMEZ delivered 3 ounces of heroin to ROGERS, he informed VALDEZ TORRES that he completed the delivery by texting the message, "It's done."

55.     At approximately 3:42PM, VALDEZ TORRES received an incoming call over Target Telephone #5 from ROGERS, who stated that he needed one right now but was still trying to get the money for the rest and almost had it. ROGERS stated that he had enough cash for one. VALDEZ TORRES said that he would tell his "friend".

56.     Based on the foregoing and my training, experience, and knowledge of this investigation, I believe that ROGERS told VALDEZ TORRES that he needed one more ounce of heroin and that ROGERS stated that he had enough money for one ounce of heroin but that he was trying to obtain money for an additional amount of heroin. I believe that VALDEZ TORRES stated that he would tell GOMEZ ("his friend").

57.     At approximately 3:43PM, VALDEZ TORRES utilized Target Telephone #4 to text GOMEZ. The text message stated, "Yonki 1 del". This was the same text message VALDEZ TORRES sent GOMEZ earlier in the day instructing GOMEZ to deliver ROGERS one ounce of heroin. GOMEZ immediately texted VALDEZ TORRES, "Ok".

58.     At approximately 4:05PM, SA Zavala established surveillance at 6040 Parkoaks Drive, Citrus Heights, California, the residence of Jason ROGERS. At approximately 4:54PM, SA Zavala observed a 2004 grey Chrysler minivan, bearing California license plate #6JSM020, previously observed being driven by members of the VALDEZ TORRES DTO, arrive at and park in front of 6040 Parkoaks Drive. At approximately 5:01PM, SA Zavala observed GOMEZ exit the side gate of the residence, walk towards and enter the grey Chrysler minivan, and depart the residence.

59.     At approximately 6:36PM, VALDEZ TORRES received an incoming call from ROGERS, who asked if he could get "2 of those black tires" and "one white". VALDEZ TORRES affirmed and said that he would be right there. Based on my training, experience, and knowledge of this investigation, I believe that ROGERS asked VALDEZ TORRES for 2 ounces of heroin ("2 of those black tires") and one ounce of methamphetamine ("one white").

22

60.     At approximately 6:40PM, VALDEZ TORRES sent a text message to GOMEZ which stated, "Yonki 2 del and like the tree". Based on my training, experience, and knowledge of this investigation, I believe that in the text message VALDEZ TORRES instructed GOMEZ to deliver 2 ounces of heroin ("2 del") and 1 ounce of methamphetamine ("like the tree") to ROGERS because VALDEZ TORRES uses "like the tree" as coded language for one ounce of methamphetamine. This is so because other intercepted conversations indicated that VALDEZ TORRES has a customer who obtains one ounce of methamphetamine every time he places an order and that that customer resides at a location with a large tree in the front yard. Accordingly, I believe that VALDEZ TORRES refers to the other customer as "arbolon" (translation: tree). Therefore, I believe that when VALDEZ TORRES stated, "like the tree", he was telling GOMEZ to deliver the same quantity of drugs that "arbolon" obtains, which is 1 ounce of methamphetamine.

61.     At 6:50PM, VALDEZ TORRES received an incoming text message from GOMEZ, which stated, "Ok".

62.     At approximately 7:45PM, SA Zavala re-established surveillance at 6040 Parkoaks Drive, Citrus Heights, ROGERS' residence. SA Zavala observed that the garage door of the residence was open and that several individuals were inside the garage. At approximately 8:10PM, GOMEZ returned to the residence in the same grey Chrylser minivan, parked the minivan across the street, exited his vehicle, and walked toward the open garage, which closed more than halfway down shortly thereafter. At approximately 8:15PM, the garage door re-opened, GOMEZ exited the garage, and he walked back to the grey minivan while talking on a cellular telephone. At approximately 8:17PM, GOMEZ departed the area in the grey minivan. At approximately 8:25PM, SA Zavala observed ROGERS, among others, standing inside the garage wearing a blue t-shirt.

63.     Based on the above-described telephone communications and surveillance, I believe that GOMEZ delivered a total of 6 ounces of heroin and 2 ounces of methamphetamine to ROGERS on May 30, 2015.

**Rogers Receives 2 ounces of heroin and 4 ounces of methamphetamine on June 5th**

64.     Intercepted communications and surveillance indicated that on June 5, 2015, VALDEZ TORRES arranged to have GOMEZ deliver 2 ounces of heroin and 4 ounces of methamphetamine to ROGERS. At approximately 6:35PM, VALDEZ TORRES received an incoming call on Target Telephone #5 from ROGERS. During the conversation, ROGERS said that he needed "4 white ones". VALDEZ TORRES said that he would be right there. ROGERS then asked for "2 black ones". VALDEZ TORRES asked ROGERS for clarification. ROGERS then stated that he needed "4 white and 2 black".

65.     Based on my training, experience, and knowledge of the investigation, I believe that ROGERS informed VALDEZ TORRES that he needed 4 ounces of methamphetamine ("4 white") and 2 ounces of heroin ("2 black").

66.     At approximately 6:36PM, VALDEZ TORRES used Target Telephone #4 to place an outgoing text message to GOMEZ. The text message stated, "Yonki 2 del and like the house." GOMEZ immediately texted VALDEZ TORRES, "Ok".

67.     Based on the foregoing and my training, experience, and knowledge of this investigation, I believe that VALDEZ TORRES instructed GOMEZ to deliver 2 ounces of heroin ("4 del") and 4 ounce of methamphetamine ("like the house") to ROGERS. Similar to how VALDEZ TORRES used the term "like the tree" to refer to one ounce of methamphetamine, I believe that VALDEZ TORRES used the term "like the house" to refer to 4 ounces of methamphetamine because other intercepted conversations indicated that a different sub-distributor, UHRIG (who VALDEZ TORRES calls "house" when talking to his runners), typically orders 4 ounces of methamphetamine at a time.[6] Therefore, when ROGERS ordered 4 ounces of methamphetamine, instead of stating 4 ounces of methamphetamine on the telephone, VALDEZ TORRES used coded language to avoid detection by law enforcement and merely stated, "4 like the house".

**ROGERS Orders Methamphetamine on June 6th**

---

[6] UHRIG lives at 6742 Kenneth Avenue, Orangevale, California. His house has a wall in front of it that is made entirely of rocks. Therefore, I believe that VALDEZ TORRES refers to UHRIG as "casa de piedra" ("house of rock") or "casa" (house) for short.

68.     On June 6, 2015, intercepted communications and surveillance indicated that
VALDEZ TORRES arranged to have GOMEZ deliver 5 ounces of methamphetamine to ROGERS.
At approximately 4:54PM, VALDEZ TORRES received an incoming call from ROGERS. During the
conversation, ROGERS stated that he needed "5 white walls". VALDEZ TORRES told ROGERS
that "he" was not answering and VALDEZ TORRES would call ROGERS back. ROGERS agreed.
ROGERS told VALDEZ TORRES that he thought "he" was leaving around 5. VALDEZ TORRES said
that he didn't think "he" left yet.

69.     Based on the foregoing conversation and my training, experience, and
knowledge of this investigation, I believe that ROGERS informed VALDEZ TORRES that he
needed 5 ounces of methamphetamine ("5 white walls"). I also believe that VALDEZ TORRES
was referring to GOMEZ when stating that "he" was not answering (the phone). Intercepted
conversations indicated that GOMEZ had planned to go out of town to pick up a supply of
drugs. I believe that ROGERS and VALDEZ TORRES discussed whether GOMEZ was still in town.

70.     At approximately 4:56PM, VALDEZ TORRES texted GOMEZ, "Call me."

71.     At approximately 5:02PM, VALDEZ TORRES placed an outgoing call to GOMEZ.
GOMEZ told VALDEZ TORRES about not getting the right amount of change at a store. GOMEZ
then told VALDEZ TORRES that he was getting ready to leave. VALDEZ TORRES told GOMEZ to
call "Nana". VALDEZ TORRES then told GOMEZ that Yonki asked for like the rock but one
more, so it would be about 5 of those. VALDEZ TORRES also told GOMEZ that Flaco would be
at "4th Avenue". VALDEZ TORRES told GOMEZ to call "Nana".

72.     Based on my training, experience, knowledge of this investigation, and review of
intercepted communications, I believe that VALDEZ TORRES instructed GOMEZ to call another
one of their distributors referred to as "Nana", who utilizes telephone number (916) 904-2623.
At approximately 4:31PM, an unidentified female contacted VALDEZ TORRES and stated that
she was looking for VALDEZ TORRES' friend (GOMEZ). VALDEZ TORRES told the unidentified
female that he would have his "friend" (GOMEZ) call her. I believe that VALDEZ TORRES then
told GOMEZ that ROGERS ("Yonki") asked for 4 ounces of methamphetamine ("like the rock")
but one more, for a total of 5 ounces of methamphetamine. I believe that VALDEZ TORRES

25

also told GOMEZ that another drug distributor, Bradley WARD ("Flaco") needed 4 ounces of methamphetamine ("4th Avenue").[7]

73.     At approximately 5:08PM, VALDEZ TORRES received an incoming call from ROGERS. VALDEZ TORRES told ROGERS that "he" answered and that "he" would be there in a minute. Accordingly, I believe that VALDEZ TORRES advised ROGERS that GOMEZ would deliver the supply of drugs to ROGERS shortly.

74.     At approximately 5:09PM, VALDEZ TORRES received an incoming call from ROGERS. ROGERS asked if he could have the 5 for 14. ROGERS then asked if he could do the 4 for 11 and VALDEZ TORRES agreed. ROGERS asked if 1450 would be okay. VALDEZ TORRES agreed. ROGERS told VALDEZ TORRES to tell his friend.

75.     Based on the foregoing conversation and my training, experience, and knowledge of this investigation, I believe that ROGERS asked VALDEZ TORRES if he could pay $1,400.00 for the 5 ounces of methamphetamine. I believe that ROGERS then asked VALDEZ TORRES if he could pay $1,100.00 for 4 ounces of methamphetamine. I believe that ROGERS then asked if he could pay $1,450.00 for the 5 ounces of methamphetamine and VALDEZ TORRES agreed. I believe that ROGERS told VALDEZ TORRES to let GOMEZ know since ROGERS would be paying GOMEZ when GOMEZ delivered the drugs.

76.     At approximately 6:00PM, SA Zavala established surveillance at 6040 Parkoaks Drive and observed ROGERS and an unknown white male standing inside the open garage of the residence. There were numerous vehicles at the residence. At approximately 6:22PM, a white Ford pickup, bearing California license plate #09485R1, arrived at and parked across the street from the residence. At approximately 6:24PM, GOMEZ walked across the street from the direction of the Ford pickup and entered the open garage of the residence. Seconds later, the garage door partially closed. At approximately 6:30PM, the garage door opened and GOMEZ stood outside the open garage. At approximately 6:32PM, GOMEZ walked across the street toward the white Ford pickup.

---

[7] At approximately 4:47PM, WARD contacted VALDEZ TORRES asked VALDEZ TORRES to "shoot 4".

**Probable Cause that Jason ROGERS is the person who utilized telephone numbers (916) 300-3609 and (916) 202-2825 to facilitate drug transactions**

77.     On June 2, 2015, at approximately 1:00PM, SA Bersamina arrived at 6040 Parkoaks Drive, Citrus Heights, California, observed Jason ROGERS, an unidentified white male adult, and two unidentified white female adults standing on the driveway of the residence. SA Bersamina positively identified ROGERS from California DMV photograph A3301786.

78.     At approximately 1:05PM, SA Bersamina maintained constant visual surveillance on ROGERS and placed a telephone call to (916) 202-2825 utilizing an undercover telephone. SA Bersamina observed that when the call was placed, ROGERS retrieved a cellular telephone from his shorts pocket and held the telephone to his ear. SA Bersamina observed that as soon as the call terminated, ROGERS returned the cellular telephone to the pocket of his shorts. Accordingly, I believe that ROGERS is the individual who utilizes cellular telephone (916) 202-2825, the telephone number referenced herein for ROGERS.

79.     Intercepted conversations over Target Telephone #1 and Target Telephone #3 indicated that ROGERS also utilized telephone number (916) 300-3609 during the course of this investigation to facilitate drug transactions. Contracted language specialists compared the voices of the person utilizing (916) 202-2825 and (916) 300-3609 and determined that the voices were identical.

**Probable Cause to Charge and Arrest BRADLEY GENE WARD and to Search His Residence at 6041 Hilltop Dr., Carmichael, California**

**WARD Orders and Receives Methamphetamine on June 2, 2015**

80.     Intercepted conversations and surveillance indicated that VALDEZ TORRES instructed GOMEZ to deliver methamphetamine to WARD on June 2, 2015. At approximately 8:25PM, on June 2, 2015, VALDEZ TORRES received an incoming call on Target Telephone #5 from WARD. During the conversation, WARD asked if VALDEZ TORRES could come and play. VALDEZ TORRES asked if "the normal"? WARD said that he needed 4. VALDEZ TORRES said that he would be right there.

81.     Based on my training, experience, and knowledge of this investigation, I believe that during the conversation WARD asked if VALDEZ TORRES could arrange to have a supply of

drugs delivered when asking if VALDEZ TORRES could "come and play". I believe that VALDEZ TORRES asked if WARD needed the usual amount of drugs when asking if WARD needed "the normal". I believe that WARD specified that he needed 4 units, believed to be 4 ounces of methamphetamine.

82.     At approximately 8:30PM, VALDEZ TORRES used Target Telephone #4 to send an outgoing text message to GOMEZ, which stated, "Flaco 4". Based on my training, experience, and knowledge of this investigation, I believe that VALDEZ TORRES instructed GOMEZ to deliver 4 ounces of methamphetamine to WARD and that VALDEZ TORRES referred to WARD as "Flaco".

83.     At approximately 8:30PM, VALDEZ TORRES received text from GOMEZ, "Ok".

84.     At approximately 8:44PM, SA Zavala drove by the residence located at 6041 Hilltop Drive, Sacramento, California, the residence of WARD. SA Zavala observed a 2008 grey Dodge Durango, bearing California license plate #6BAC754, parked across the street from 6041 Hilltop Drive. At approximately 8:51PM, SA Zavala observed the grey Dodge Durango depart from the neighborhood of 6041 Hilltop Drive.

85.     At approximately 8:51PM, VALDEZ TORRES received an incoming text message from GOMEZ which stated, "Done".

86.     Based on the foregoing, I believe that GOMEZ confirmed that he delivered 4 ounces of methamphetamine to WARD.

**WARD Orders 4 Ounces of Methamphetamine on June 2, 2015**

87.     Intercepted conversations and surveillance indicated that VALDEZ TORRES arranged to have GOMEZ deliver 4 ounces of methamphetamine to WARD on June 6, 2015. At approximately 4:47PM, VALDEZ TORRES received an incoming call from (916) 223-7423, utilized by WARD. During the conversation, WARD asked if VALDEZ TORRES had called him. VALDEZ TORRES affirmed and stated that his "friend" was leaving today and coming back tomorrow. WARD asked if he ("friend") was around now. VALDEZ TORRES affirmed. WARD asked VALDEZ TORRES if he could shoot 4. VALDEZ TORRES said that he would call and that it may be a bit. WARD agreed.

88.     Other intercepted conversations indicated that GOMEZ had planned to go out of town to pick up a supply of drugs. Accordingly, based on my knowledge of this investigation, training, and experience, I believe that VALDEZ TORRES contacted WARD to let WARD know that GOMEZ was going to be out of town in case WARD needed a supply of drugs before GOMEZ left. I further believe that WARD confirmed that GOMEZ ("friend") was still in town and asked VALDEZ TORRES to send GOMEZ with 4 ounces of methamphetamine. I believe that VALDEZ TORRES agreed and stated that it may be a little while before GOMEZ could deliver the drugs.

89.     At approximately 5:02PM, VALDEZ TORRES placed an outgoing call to GOMEZ. During the conversation, VALDEZ TORRES told GOMEZ that "Flaco" would be at the "4th Avenue". GOMEZ agreed. During this conversation, VALDEZ TORRES also instructed GOMEZ to deliver 5 ounces of methamphetamine to ROGERS and to call another drug distributor, an unknown female referred to as "Nana". Based on the foregoing and my training, experience and knowledge of this investigation, I believe that VALDEZ TORRES instructed GOMEZ to deliver 4 ounces of methamphetamine ("4th Avenue") to WARD ("Flaco").

90.     At approximately 6:34PM, SA Zavala drove 6041 Hilltop Drive, Carmichael, California, the residence of Bradley WARD. SA Zavala observed a white Ford pickup, bearing California license plate #09485R1, parked in front of the residence. GOMEZ exited the front driver's seat of the vehicle and walked toward the open garage of the residence. At approximately 6:41PM, GOMEZ walked back to the Ford pickup, entered the driver's seat, and departed the area.

91.     At approximately 6:49PM, VALDEZ TORRES received an incoming text message from GOMEZ which stated, "Flaco done". Accordingly, I believe that GOMEZ informed VALDEZ TORRES that he completed the drug delivery to WARD.

**Probable Cause that Bradley WARD is the person who utilized telephone numbers (916) 561-9875, (916) 626-1327, and (916) 223-7423 to facilitate drug transactions**

92.     On April 1, 2015, at approximately 1:10PM, SA Zavala and I drove by the residence located at 6041 Hilltop Drive, Carmichael, California, the residence of Bradley WARD. SA Zavala and I observed WARD standing by the open driver's side door of a black 2001 Infiniti,

bearing California license plate #7DIM086, registered to Crystal Marie Ward at 6041 Hilltop Drive. Moments later, WARD walked away from the vehicle toward the front of his residence and then back to the vehicle. WARD appeared to be cleaning the interior of the vehicle.

93.     Between March 2015 and June 2015, agents have observed no less than 3 different runners for the VALDEZ TORRES DTO travel to 6041 Hilltop Drive, Carmichael, California, on numerous occasions following intercepted telephone conversations in which "Flaco", the person utilizing telephone numbers (916) 561-9875 and (916) 223-7423, requested a supply of drugs from VALDEZ TORRES. On each occasion, VALDEZ TORRES' runner walked to and entered the front door or garage of the residence and agents were unable to observe who VALDEZ TORRES' runners met with. Agents have observed WARD at the residence on several separate occasions.

94.     On April 23, 2015, Citrus Heights Police Department Detective Tom Lamb provided agents with information pertaining to separate investigation involving Bradley WARD. Detective Lamb stated that on or about April 3, 2015, WARD left Detective Lamb a voicemail pertaining to enforcement activity occurring at a residence associated with WARD's family member. On April 16, 2015, WARD contacted Detective Lamb from telephone number (916) 561-9875, the same phone used by WARD to facilitate drug transactions.

95.     Contracted language specialists compared the voices of the person utilizing (916) 561-9875, (916) 626-1327, and (916) 223-7423 and determined that the voices on all three telephones were identical. I believe that WARD utilized (916) 561-9875, (916) 626-1327, and (916) 223-7423 to facilitate drug transactions.

**Probable Cause to Charge and Arrest Shannon Anthony ARMSTRONG and to Search His Residence at 555 Encina Dr., El Dorado Hills, California**

### ARMSTRONG Orders and Receives Methamphetamine on March 25th

96.     The following are a series of intercepted telephone calls which took place on March 25, 2015. Intercepted conversations and surveillance indicated that VALDEZ TORRES instructed his drug runner, an unidentified male known as MARTIN, to deliver a large quantity of methamphetamine to Shannon AMRSTRONG at the Starbucks Coffee Shop located at 6306

30

Garfield Avenue, Sacramento, California. ARMSTRONG is VALDEZ TORRES largest distributor of methamphetamine in the Sacramento area and has contacted VALDEZ TORRES on a frequent basis since interception began in March 2015.

97.     On March 25, 2015, at approximately 4:22PM, VALDEZ TORRES received an incoming call on Target Telephone #1 from ARMSTRONG. ARMSTRONG stated that he needed to see VALDEZ TORRES for "a couple" and that he wanted to meet the guy at Starbucks because he was driving that way and he needed a half an hour. VALDEZ TORRES agreed and said that the guy would be there too.

98.     Based on my training, experience, and knowledge of this investigation, I believe that during the foregoing conversation ARMSTRONG told VALDEZ TORRES that he needed 2 pounds of methamphetamine when he stated that he needed to see VALDEZ TORRES for "a couple". I further believe that ARMSTRONG asked VALDEZ TORRES to have his runner meet ARMSTONG at the Starbucks coffee shop. At this time, VALDEZ TORRES' Sacramento runner was an individual known as "MARTIN".

99.     At approximately 4:24PM, VALDEZ TORRES placed an outgoing call to ARMSTRONG. During the conversation, VALDEZ TORRES asked ARMSTRONG, "Yesterday, yesterday, you be short, right?" ARMSTRONG replied, "Yeah, I got it for you." VALDEZ TORRES said he just wanted to know.

100.    Intercepted conversations indicated that MARTIN had delivered 3 pounds of methamphetamine to ARMSTRONG the previous day (March 24, 2015). Intercepted conversations also indicated that ARMSTRONG had paid MARTIN "14", believed to be $14,000. Based on the quantity of drugs and amount of money exchanged, I believe that ARMSTRONG obtained 3 pounds of methamphetamine from VALDEZ TORRES and MARTIN on March 24, 2015. I believe that VALDEZ TORRES confirmed with ARMSTRONG that ARMSTRONG did not pay the full amount ("you be short") on March 24, 2015 for the 3 pounds of methamphetamine. I believe that ARMSTRONG confirmed that he did not pay the full amount but stated that he had the remaining amount of money for VALDEZ TORRES ("I got it for you").

101.    At approximately 4:25PM, VALDEZ TORRES placed an outgoing call to his drug runner, MARTIN. VALDEZ TORRES told MARTIN to stop what he was doing and go to where the

31

coffee was and that "Venado" would be there and wanted 2. MARTIN said that he would head over there now. VALDEZ TORRES said that "Venado" would be there in 30 minutes and that MARTIN should head over there calmly and not in a rush and that if there was traffic VALDEZ TORRES would let "Venado" know. MARTIN confirmed that it was "2". VALDEZ TORRES affirmed and stated that "Venado" would possibly have the money that was owed from yesterday as well.

102.    Based on my training, experience, and knowledge of this investigation, I believe that during the foregoing conversation VALDEZ TORRES referred to ARMSTRONG as "Venado" (translation: deer) because ARMSTRONG lives in an area of El Dorado Hills where there are a lot of deer; indeed, the main road that leads to ARMSTRONG's house has signs cautioning drivers of the presence of deer. I further believe that VALDEZ TORRES instructed MARTIN to meet ARMSTRONG at Starbucks ("coffee") to deliver 2 pounds of methamphetamine. I believe that VALDEZ TORRES advised MARTIN that ARMSTRONG would not arrive at the Starbucks for at least 30 minutes and that MARTIN should drive slowly and with caution ("calmly and not in a rush"). I believe that VALDEZ TORRES was concerned because MARTIN would be transporting a large quantity of drugs (2 pounds of methamphetamine). I believe that VALDEZ TORRES informed MARTIN that ARMSTRONG may bring the money owed from the 3-pound transaction the day before.

103.    At approximately 4:56PM, VALDEZ TORRES received an incoming text message from ARMSTRONG, "I'm here."

104.    At approximately 4:56PM, VALDEZ TORRES placed an outgoing call to MARTIN. MARTIN advised VALDEZ TORRES that there was a lot of traffic and that he was about 20 minutes away. At approximately 4:59PM, VALDEZ TORRES called ARMSTRONG and advised him that MARTIN was in traffic. ARMSTRONG agreed to wait for MARTIN at the Starbucks. At approximately 4:59PM, VALDEZ TORRES called MARTIN and advised him that ARMSTRONG would wait at the Starbucks for him.

105.    At approximately 5:14PM, SA Zavala established surveillance at the Starbucks located at 6306 Garfield Avenue, Sacramento, California. SA Zavala observed a white male adult, wearing a red shirt and a black ball cap, seated alone at an outside table in front of

32

Starbucks. SA Zavala subsequently positively identified the male as Shannon Anthony ARMSTRONG from California driver's license A9459375. At approximately 5:20PM, SA Zavala observed a white Ford pickup, bearing California license plate #09485R1, driven by a Hispanic male subsequently identified as MARTIN, stopped at the intersection of Greenback Lane and Garfield Avenue. At approximately 5:22PM, MARTIN drove into the Starbucks parking lot and parked while on his cellular telephone. MARTIN exited the Ford pickup and looked around the parking lot.

106.    At approximately 5:24PM, VALDEZ TORRES received an incoming call from MARTIN, who stated he was there at the corner and had arrived.

107.    At approximately 5:27PM, VALDEZ TORRES placed an outgoing call to ARMSTRONG and stated that his guy (MARTIN) was there at the coffee (Starbucks). ARMSTRONG stated that he was walking to his car and then ARMSTRONG stated that he saw the guy (MARTIN).

108.    Meanwhile, at approximately 5:23PM, SA Zavala observed ARMSTRONG stand up from the table in front of the Starbucks and walk into the parking lot while speaking on a cellular telephone. ARMSTRONG then waved to and walked toward MARTIN. MARTIN and ARMSTRONG spoke briefly while ARMSTRONG pointed to another section of the parking lot. MARTIN re-entered the driver's seat of the Ford pickup. ARMSTRONG walked to a blue Hyundai sedan, bearing California license plate #5GSF836, and opened the passenger side door. At approximately 5:25PM, SA Zavala observed ARMSTRONG walk across the parking lot towards the white Ford pickup, carrying a black bag. SA Schmid observed ARMSTONG stand at the passenger side of the Ford pickup and then walk back to the blue Hyundai sedan.

109.    Immediately thereafter, MARTIN and ARMSTRONG exited the Starbucks parking lot and departed the area.

110.    At approximately 5:31PM, VALDEZ TORRES received an incoming text message from MARTIN, "It's done."

**ARMSTRONG Orders and Receives Methamphetamine on June 3rd**

111.    On June 3, 2015, between approximately 10:38AM and 11:08AM, VALDEZ TORRES received 5 incoming calls from ARMSTRONG, which VALDEZ TORRES did not answer.

33

112.    At approximately 12:05PM, VALDEZ TORRES placed an outgoing call to GOMEZ. GOMEZ told VALDEZ TORRES that Venado (ARMSTRONG) called him and that GOMEZ was going to go see ARMSTRONG.  GOMEZ said he tried calling VALDEZ TORRES but VALDEZ TORRES' phone was off.  GOMEZ stated that he was waiting for his wife who was on the road.  VALDEZ TORRES told GOMEZ that GOMEZ and ARMSTRONG should come to an agreement.  VALDEZ TORRES told GOMEZ to have ARMSTRONG check them and if ARMSTRONG doesn't check them to ask ARMSTRONG if they were good.  GOMEZ stated that he was waiting for his wife and then he would head over.  VALDEZ TORRES told GOMEZ to check that there and that VALDEZ TORRES would call GOMEZ later.  GOMEZ then stated that he had not checked everything from the guy from yesterday and he got 2.  VALDEZ TORRES said that they were sent like that, in parts, and that they were small parts and GOMEZ should check it.  VALDEZ TORRES asked GOMEZ to check them when he got a chance but they come in parts all the time.  GOMEZ stated that the two small parts, the tools from yesterday, were done and almost on the 30th Avenue.  VALDEZ TORRES told GOMEZ to still check the rest and everything has to be there.

113.    Based on my training, experience, and knowledge of this investigation, I believe that ARMSTRONG could not get a hold of VALDEZ TORRES, so he contacted GOMEZ to request a supply of drugs.  I further believe that GOMEZ informed VALDEZ TORRES that he was going to deliver a supply of drugs to ARMSTRONG ("go see him") and that VALDEZ TORRES told GOMEZ to have ARMSTRONG check the quality of the drugs. (In a previous conversation, ARMSTRONG contacted VALDEZ TORRES and complained about the quality of the drugs.)  I believe that GOMEZ told VALDEZ TORRES that he was waiting for his wife to return home with the vehicle so he could deliver the drugs to ARMSTRONG.  I believe that GOMEZ received a supply of drugs (2 units, possibly 2 kilograms of heroin) the previous day and GOMEZ advised VALDEZ TORRES that he had not weighed and processed ("checked") those drugs yet.  I believe that GOMEZ indicated that he processed some of the drugs already and possibly converted the drugs into smaller units, possibly 30 pieces of heroin ("30th Avenue").  I believe that VALDEZ TORRES told GOMEZ to make sure they received the correct amount of drugs.

34

114.    At approximately 12:54PM, VALDEZ TORRES received an incoming text message from (530) 414-6474, which stated, "Hey call me need to see you thank u." I believe that ARMSTRONG indicated that he needed a supply of drugs."

115.    At approximately 1:06PM, VALDEZ TORRES placed an outgoing call to ARMSTRONG at (530) 414-6474. During the conversation, ARMSTRONG stated that he needed to see "you". VALDEZ TORRES said that he already talked with his "friend" and his friend said to wait. ARMSTRONG affirmed. VALDEZ TORRES then stated, "Help me out because...you know... I got that...you know... or whatever you can, you know what I mean?" ARMSTRONG agreed.

116.    I believe that VALDEZ TORRES advised that he had already spoken with his runner, GOMEZ, and GOMEZ was busy at the moment and that ARMSTRONG would have to wait. I believe that VALDEZ TORRES asked ARMSTRONG to pay back all or part of the money owed for a drug debt when asking ARMSTRONG to "help me out... whatever you can."

### Probable Cause to Search 4400 Shandwick Drive, #237, Antelop, California (Stash House)

117.    At approximately 1:20PM, on June 3, 2015, SA Bersamina established surveillance at the Antelope Ridge Apartment complex located at 4400 Shandwick Drive, Antelope, California ( a suspected stash house for the VALDEZ TORRES DTO). SA Bersamina observed both of GOMEZ's known vehicles parked near building #23 of the apartment complex: (1) 2008 grey Dodge Durango, California license plate #6BAC754, and (2) 2004 grey Chrysler minivan, California license plate #6JSM020. At approximately 1:23PM, GOMEZ exited an apartment located in Building #23 and walked toward the grey Chrysler minivan (CA#6JSM020) carrying a black, grey, and green backpack. At approximately 1:26PM, GOMEZ departed in the grey minivan.

118.    At approximately 2:22PM, VALDEZ TORRES received an incoming text message from ARMSTRONG, "Where is he I have to leave soon."

119.    At approximately 2:22PM, VALDEZ TORRES placed an outgoing call to GOMEZ. During the conversation, VALDEZ TORRES told GOMEZ that ARMSTRONG needed to leave soon and asked GOMEZ what time VALDEZ TORRES should tell ARMSTRONG to expect GOMEZ. GOMEZ stated that he was already entering where ARMSTRONG's territory begins. VALDEZ

TORRES asked if he should send ARMSTRONG a text message.  GOMEZ said no because he would arrive in 5 minutes.

120.    At approximately 2:23PM, VALDEZ TORRES placed an outgoing text message to GOMEZ, "5 minutes".

121.    At approximately 2:27PM, Folsom Police Department Sergeant Lewis observed GOMEZ's grey Chrysler minivan (CA#6JSM020) parked in the upper parking area of ARMSTRONG's residence located at 555 Encina Drive, El Dorado Hills, California.  Seconds later, ARMSTRONG opened the front door of this residence while GOMEZ entered the residence carrying a backpack similar to the backpack SA Bersamina observed GOMEZ carrying at his apartment complex in Antelope immediately before departing.

122.    At approximately 3:02PM, VALDEZ TORRES placed an outgoing text message to ARMSTRONG which stated, "It's done?"  Accordingly, I believe that VALDEZ TORRES asked GOMEZ if GOMEZ completed the drug delivery to ARMSTRONG.

123.    At approximately 3:03PM, VALDEZ TORRES received an incoming call from GOMEZ.  GOMEZ told VALDEZ TORRES that he was with him (ARMSTRONG) and was about to leave.  GOMEZ stated that he saw him (ARMSTRONG) on the 4th Avenue and only 1 peso would be pending.

124.    Based on my training, experience, and knowledge of this investigation, I believe that ARMSTRONG informed VALDEZ TORRES that he was with ARMSTRONG at the moment.  I believe that GOMEZ informed VALDEZ TORRES that he gave ARMSTRONG 4 units (believed to be 4 pounds or methamphetamine) and that ARMSTRONG owed $1,000 (1 peso).

125.    At approximately 3:07PM, GOMEZ's Chrysler minivan departed the neighborhood of 555 Encina Drive, El Dorado Hills, California.

**ARMSTRONG Orders and Receives Methamphetamine on June 16th**

126.    At approximately 2:46PM, VALDEZ TORRES received an incoming call from ARMSTRONG, who stated that he needed to see VALDEZ TORRES.  VALDEZ TORRES stated that he would be right there.

127.    Based on my training, experience, and knowledge of this investigation, I believe that ARMSTRONG advised VALDEZ TORRES that he needed a supply of drugs when stating that

he needed to see VALDEZ TORRES. I believe that VALDEZ TORRES advised ARMSTRONG that he would send his runner when stating that he would be right there.

128.    At approximately 2:50PM, VALDEZ TORRES placed an outgoing text message to (916) 298-3163, utilized by GOMEZ, which stated, "Benado 3 of". Based on my training, experience, and knowledge of this investigation, I believe that VALDEZ TORRES instructed GOMEZ to deliver 3 pounds of methamphetamine to ARMSTRONG.

129.    At approximately 3:56PM, SA Bersamina observed GOMEZ depart the Butterfly Garden Apartment complex located at 9190 Tuolumne Drive, Sacramento in the grey Chrysler minivan. At approximately 4:29PM, Folsom Police Department Detectives Kehm and Canepa drove by ARMSTRONG's residence located at 555 Encina Drive, El Dorado Hills, California. Detectives observed a 2015 silver Nissan Altima (CA#7GSF275) parked in the driveway of the residence. Detectives also observed a 2001 gold Honda sedan (CA#4RYX692) and a 2005 dark grey Toyota Tacoma (CA#49737C1) parked in the upper parking area of the residence.

130.    At approximately 4:40PM, Detective Herndon observed the silver Nissan Altima arrive at the Safeway parking lot located at 2207 Francisco Drive, El Dorado Hills and park in front of GOMEZ's grey Chrysler minivan. ARMSTRONG exited the silver Altima, retrieved a black bag from the rear passenger seat of the silver Altima, and walked to and entered the front passenger seat of the Chrysler minivan while carrying the black bag.

131.    At approximately 4:41PM, ARMSTRONG exited the Chrysler minivan carrying the black bag and entered the front driver's seat of the silver Altima. The silver Altima departed the Safeway parking lot in tandem with the gold Honda previously observed at 555 Encina Drive.

132.    Based on the foregoing and my training, experience, and knowledge of this investigation, I believe that GOMEZ transferred 3 pounds of methamphetamine to Shannon ARMSTRONG at the Safeway parking lot in El Dorado Hills, California.

**Probable Cause that Shannon ARMSTRONG is the person who utilized telephone numbers (916) 230-0803 and (530) 414-6474 to facilitate drug transactions**

133.    Agents conducted surveillance no less than 5 times surrounding intercepted conversations indicating that ARMSTRONG would participate in a drug transaction with a member of the VALDEZ TORRES DTO. Agents observed a member and/or vehicle belonging to

37

the VALDEZ TORRES DTO at ARMSTRONG's residence at least 3 times. Agents observed a member of the VALDEZ TORRES DTO meet with ARMSTRONG 2 times at a public location.

134.   Contracted language specialists compared the voices of the person utilizing (916) 230-0803 and (530) 414-6474 and determined that the voices intercepted over the two telephones were identical. I believe that ARMSTRONG utilized (916) 230-0803 and (530) 414-6474 to facilitate drug transactions.

**Probable Cause to Charge and Arrest Enrique Alonso VALDEZ YAÑEZ and William WELCH and to Search WELCH's Residence at 7203 Grady Dr., Citrus Heights, California**

**WELCH Orders and Receives Additional Methamphetamine on May 19th**

135.   On March 19, 2015 at approximately 5:52PM, VALDEZ TORRES received an incoming call on Target Telephone #1 from (916) 548-6524 (Subscriber: William Welch), utilized by William WELCH. During the conversation, WELCH stated that he needed to see VALDEZ TORRES. VALDEZ TORRES said he would be right there.

136.   Based on my training, experience, and knowledge of this investigation, I believe that WELCH asked VALDEZ TORRES to supply him with an unknown quantity and type of drug. I believe that WELCH ordered the same amount and type of drug on a frequent and consistent basis and therefore did not have to specify the type and quantity of drug.

137.   At approximately 5:54PM, VALDEZ TORRES sent an outgoing text message to VALDEZ YANEZ, which stated, "Bluglenton". Based on my training, experience, and knowledge of this investigation, I believe that VALDEZ TORRES refers to WELCH as "Burlington" or "store" because WELCH's residence, located at 7203 Grady Drive, Citrus Heights, California, is located behind the Burlington Coat Factory store. At approximately 5:55PM, VALDEZ TORRES received an incoming text message from VALDEZ YANEZ which stated, "Ok."

138.   At approximately 6:05PM, SA Zavala and I established surveillance at 7203 Grady Drive, Citrus Heights, California, the residence of WELCH, where a 1994 white Mercury Cougar, bearing California license plate #3HKZ630, was parked in the driveway. A 1998 burgundy Lexus sedan, bearing California license plate #6YPV003 and a 1997 green Chevy pickup, bearing California license plate #43622G1, were parked in front of the residence. Both the Lexus and

the Chevy pickup were registered to William Welch at 7203 Grady Drive, Citrus Heights,
California.

139.    At approximately 6:21PM, SA Zavala observed VALDEZ YANEZ, a known drug
runner for the VALDEZ TORRES DTO, and William WELCH exit the front door of the residence
and briefly speak with each other in the front yard. Moments later, SA Zavala observed VALDEZ
YANEZ walk to the white Mercury Cougar and depart the area. At the same time, SA Zavala
observed WELCH enter the front door of the residence.

140.    Based on intercepted conversations involving other drug transactions and drug
distributors, I believe that WELCH typically receives between ½ pound and 1 pound of
methamphetamine per transaction. Specifically, on March 25, 2015, VALDEZ TORRES instructed
one of his runners, MARTIN, to deliver the same amount and type of drug to Michael
McGIBBON as "like the store". Based on that directive, my training, experience, and knowledge
of this investigation, I believe that VALDEZ TORRES was referring to WELCH when using the
term "store". After MARTIN made the drug delivery to McGIBBON, MARTIN told VALDEZ
TORRES that McGIBBON paid MARTIN $2,800.00. Based on my training and experience and
familiarity with the current price of drugs, I believe that McGIBBON received ½ pound to 1
pound of methamphetamine. The current street price of methamphetamine in the Sacramento
area is approximately $4,000.00 per pound. I believe that McGIBBON either received a ½
pound of methamphetamine and paid extra for a past drug debt, or McGIBBON received one
pound of methamphetamine and did not pay the entire amount. Therefore, based on VALDEZ
TORRES' statement "like the store," I believe that WELCH also obtains ½ to 1 pound quantities
of methamphetamine on each occasion.

**WELCH Orders Additional Methamphetamine on May 31st**

141.    On May 31, 2015, at approximately 8:54PM, VALDEZ TORRES received an
incoming call over Target Telephone #1 from WELCH. During the conversation, VALDEZ TORRES
informed WELCH that his (VALDEZ TORRES') "friend" was not here. VALDEZ TORRES said that
his friend had gone out on a family vacation and would be back the following night. WELCH
stated that he had someone with him from out of town. WELCH said that it would have to be
tomorrow. VALDEZ TORRES affirmed that it would be the following night. WELCH asked

VALDEZ TORRES what time his friend would arrive. VALDEZ TORRES stated that he did not know what time his friend would arrive and that this friend was camping with his family. VALDEZ TORRES said that he would call WELCH the following day, as soon as possible the following night. WELCH stated that he had someone from out of town, from Reno. VALDEZ TORRES apologized. WELCH asked VALDEZ TORRES to let WELCH know as soon as possible.

142.    Based on my training, experience, and knowledge of this investigation, I believe that VALDEZ TORRES immediately informed WELCH that his runner, GOMEZ ("friend"), was out of town because VALDEZ TORRES knew that the reason WELCH was calling was to request a supply of drugs. Intercepted conversations and surveillance indicated that GOMEZ left Sacramento on the evening of May 31, 2015, for the purpose of picking up supplies of drugs in Southern California the following day (June 1, 2015). I believe that VALDEZ TORRES informed WELCH that GOMEZ would return the following evening and would be able to deliver a supply of drugs to WELCH then. I believe that WELCH advised VALDEZ TORRES that he had a visitor from Reno because WELCH needed the drugs from VALDEZ TORRES to supply the customer from Reno. Previous intelligence indicated that WELCH supplies an individual or individuals from the Reno, Nevada area with large amounts of heroin and methamphetamine. In December 2014, I was informed of a cooperating defendant in Nevada who identified WELCH as a multi-pound distributor of methamphetamine.

143.    On June 1, 2015, at approximately 6:10PM, VALDEZ TORRES received an incoming call from (916) 548-6524, utilized by WELCH. During the conversation, VALDEZ TORRES stated that he would arrive around 8 or 9. WELCH asked if he could come any earlier. VALDEZ TORRES replied no. WELCH stated that he had someone there from Reno. VALDEZ TORRES apologized and stated that he would call WELCH.

144.    Based on my training, experience, and knowledge of this investigation, I believe that VALDEZ TORRES advised WELCH that GOMEZ would not arrive in Sacramento until 8pm or 9pm that evening. I believe that WELCH asked if GOMEZ could deliver the drugs any sooner because WELCH had a customer from Reno waiting. I believe that WELCH emphasized that he had someone from Reno there because VALDEZ TORRES was aware that WELCH supplied an individual from Reno with drugs.

40

145.    At approximately 8:47PM, VALDEZ TORRES received an incoming call from WELCH. During the conversation, VALDEZ TORRES told WELCH that his friend was driving on the highway but would be there soon. VALDEZ TORRES said that he would call WELCH as soon as possible. WELCH asked if it would be within the hour. VALDEZ TORRES said maybe but that his friend would definitely be there. WELCH asked if it would be tonight for sure. VALDEZ TORRES affirmed. WELCH said that his (WELCH's) friend was anxious to get on the road. VALDEZ reiterated that it would be today.

146.    Surveillance indicated that after obtaining two supplies of drugs in Southern California, GOMEZ stopped briefly in Delano, and continued to Sacramento, arriving in the Sacramento area at approximately 10:00PM.

147.    At approximately 10:09PM, I drove by the residence located at 7203 Grady Drive, Citrus Heights. I observed WELCH's burgundy Lexus parked in the driveway of the residence and his Chevy pickup parked on the street in front of the residence. I also observed a champagne-colored Toyota sedan, bearing California license plate #4MYB715 and a 1996 white Chevy Astro van, bearing Nevada license plate #242XXL, parked at the residence. A records check revealed that the Chevy Astro van was registered to Randall Turner, 11895 Carson Highway, Fallon, Nevada.

148.    At approximately 10:58PM, I observed GOMEZ's grey Chrysler minivan (CA#6JSM020) parked in front of the residence. I observed that the Chevy Astro van was no longer parked at the residence. At approximately 11:20PM, the Chrysler minivan departed.

149.    At approximately 11:14PM, VALDEZ TORRES received an incoming text message from GOMEZ that stated, "Burlington done".

**Probable Cause that William WELCH is the person who utilized telephone number (916) 548-6524 to facilitate drug transactions**

150.    On April 14, 2015, at approximately 12:50PM, agents established surveillance at 7203 Grady Drive, Citrus Heights, California. Agents observed WELCH's previously observed burgundy Lexus sedan (CA#YPV003 – registered to William Welch) and green Chevy pickup (CA#43622G1 – registered to William Welch), and a 2001 white Chevy pickup (CA#6S11450 – registered to Harelson Mechanical Inc.) parked at the residence.

41

151.   At approximately 1:51PM, SA Zavala placed an outgoing call to (916) 548-6524 from an undercover telephone. The phone call was not answered. WELCH then entered his residence through the front door. At approximately 2:04PM, SA Zavala received an incoming call on the undercover phone from (916) 548-6524. The male calling informed SA Zavala that his name was "Bill" and was wondering why SA Zavala called him. SA Zavala recognized the voice of "Bill" as that of the individual intercepted engaging in drug related conversations with VALDEZ TORRES over the target telephones. In addition, (916) 548-6524 is subscribed to William Welch at 7299 Grady Drive, Citrus Heights, California. I therefore believe that WELCH is the individual who utilizes cellular telephone (916) 548-6524 to facilitate drug transactions.

**Probable Cause to Charge and Arrest Enrique Alonso VALDEZ YANEZ and David UHRIG and to Search UHRIG's Residence at 6742 Kenneth Avenue, Orangevale, California**

### UHRIG Orders 4 Ounces of Methamphetamine on March 18th

152.   On March 18, 2015, at approximately 3:13PM, VALDEZ TORRES, received an incoming text message over Target Telephone #1 from (916) 990-6892 (Subscriber: Ronald Riley), utilized by David Andrews UHRIG.   The text message stated, "You around?"

153.   At approximately 3:14PM, VALDEZ TORRES responded, "Yes".

154.   Based on my training, experience, and knowledge of this investigation, I believe that UHRIG asked VALDEZ TORRES to supply him with an unknown quantity and type of drug when merely asking, "Are you around?" I believe that UHRIG ordered the same amount and type of drug on a frequent and consistent basis and therefore did not have to specify the type and quantity of drug.

155.   At approximately 3:15PM, VALDEZ TORRES sent an outgoing text message to (916) 826-4954 (Subscriber: Jose Sanchez), utilized by Enrique VALDEZ YANEZ. The text message stated, "In how long to the house?"

156.   At approximately 3:19PM, VALDEZ TORRES placed an outgoing call to VALDEZ YANEZ. During the conversation, VALDEZ TORRES asked VALDEZ YANEZ how long it would take him to arrive at "the house". VALDEZ YANEZ said that it would take whatever amount of time it took to go from here to there. VALDEZ TORRES said that he sent a message to VALDEZ YANEZ

but that VALDEZ YANEZ did not respond. VALDEZ YANEZ apologized and said that he did not see the message. VALDEZ TORRES asked if VALDEZ YANEZ could see they guy in 15 or 20 minutes. VALDEZ YANEZ said that it depended on the traffic. VALDEZ TORRES said that he would tell the guy 30 minutes.

157.    Based on my training, experience, and knowledge of this investigation, I believe that VALDEZ TORRES used the term "casa" to refer to UHRIG because UHRIG resides at 6742 Kenneth Avenue, Orangevale, California. 6742 Kenneth Drive has a wall in front of the house that is made entirely of rocks. Therefore, I believe that VALDEZ TORRES refers to UHRIG as "casa de piedra" (house of rock") or "la casa" (the house) for short. Based on intercepted conversations involving drug transactions with other individuals, I believe that UHRIG always orders 4 ounces of methamphetamine. For example, Jason ROGERS, another one of VALDEZ TORRES distributors, orders various quantities of methamphetamine and heroin. When ROGERS contacts VALDEZ TORRES, he specifies how many ounces of heroin and how many ounces of methamphetamine he needs by using terms like "black tires" or "black" for heroin and "white walls" or "white" for methamphetamine. VALDEZ TORRES then instructs contacts his runner and tells the runner how many ounces of heroin and methamphetamine to deliver to ROGERS using his own coded language. If ROGERS ordered "2 black tires and 4 white walls", VALDEZ TORRES would then tell his runner to deliver "2 del and 1 like the house". I believe that VALDEZ TORRES uses the term "like the house" to refer to the quantity of methamphetamine that UHRIG (the "house") always orders – 4 ounces of methamphetamine.

158.    At approximately 3:20PM, VALDEZ TORRES texted UHRIG, "25 min". One minute lalter, UHRIG texted VALDEZ TORRES, "ok thanks."

159.    At approximately 3:50PM, agents established surveillance at 6742 Kenneth Avenue, Orangevale, California, the residence of UHRIG. Agents observed a dark green Toyota pickup (CA#5L60257), a white Volvo station wagon (CA#4ZVC593), and a tan Chevrolet pickup (CA#5K94772) parked at the residence. At approximately 4:10PM, SA Montserrat observed a white Mercury Cougar (CA#3HKZ630), arrive at and park in front of the residence. SA Montserrat observed a Hispanic male, wearing a bright green long-sleeved t-shirt, identified as VALDEZ YANEZ, exit the vehicle and stand outside near the vehicle for a few minutes. VALDEZ

YANEZ then entered the vehicle and departed the area.  A few minutes later, SA Montserrat observed the Mercury Cougar return to the residence and pull into the driveway, out of sight. After a few minutes, SA Montserrat observed VALDEZ YANEZ depart the residence in the Mercury Cougar.  I believe that VALDEZ YANEZ delivered 4 ounces of methamphetamine to UHRIG at 6742 Kenneth Avenue.

### UHRIG Orders 4 Ounces of Methamphetamine on May 30th

160.    On May 30, 2015, at approximately 1:18PM, VALDEZ TORRES received an incoming text message over Target Telephone #4 from UHRIG, "You around?

161.    At approximately 1:18PM, VALDEZ TORRES sent an outgoing text message in response that stated, "Yes 20 min".

162.    At approximately 1:19PM, VALDEZ TORRES received an incoming text message from UHRIG which stated, "Thanks".

163.    Based on my training, experience, and knowledge of this investigation, I believe that UHRIG asked VALDEZ TORRES for a supply of 4 ounces of methamphetamine and VALDEZ TORRES advised UHRIG that his runner, GOMEZ, would deliver the drugs in approximately 20 minutes.

164.    At approximately 1:19PM, VALDEZ TORRES sent an outgoing text message to GOMEZ, which stated, "House".  GOMEZ immediately responded via text message, "Ok".

165.    At approximately 1:19PM, VALDEZ TORRES sent an outgoing text message to GOMEZ which stated, "of rock".  Based on my training, experience, and knowledge of this investigation, I believe that VALDEZ TORRES clarified that GOMEZ was to go to UHRIG's house, the "house of rock".

166.    Geolocation data for GOMEZ's telephone indicated that at approximately 1:12PM, GOMEZ was located in Antelope, California.  At approximately 2:03PM, geolocation data indicated that GOMEZ was near the area of 6742 Kenneth Avenue, Orangevale, California.

167.    At approximately 2:18PM, VALDEZ TORRES received an incoming text message from GOMEZ which stated, "House done".  Based on the foregoing and on my training, experience, and knowledge of this investigation, I believe that GOMEZ advised VALDEZ TORRES that he completed the delivery of 4 ounces of methamphetamine to UHRIG.

44

**Probable Cause that David Andrews UHRIG is the person who utilized telephone number (916) 990-6892 to facilitate drug transactions**

168. On June 4, 2015, at approximately 1:35PM, SA Bersamina established surveillance at 6742 Kenneth Avenue, Orangevale, California. SA Bersamina observed a light-colored Infinity SUV, bearing California license plate #3WQA328 (registered to Flora Elizabeth Woodin or Crystal Elizabeth Woodin in Ukiah, CA) parked on the street in front of the residence.

169. At approximately 1:45PM, SA Bersamina observed UHRIG standing in the driveway of 6742 Kenneth Avenue. SA Bersamina identified UHRIG from California DMV photograph C6911655. SA Bersamina maintained constant visual surveillance of UHRIG while placing a phone call to (916) 990-6892 using an undercover telephone. Upon dialing (916) 990-6892, SA Bersamina observed UHRIG retrieve a cellular telephone from his pocket and hold the phone up to his ear. SA Bersamina observed that as soon as the phone call was terminated, UHRIG removed the phone from his ear and placed the phone back in his pocket. Accordingly, I believe that UHRIG is the individual who utilizes cellular telephone (916) 909-6892 to facilitate drug transactions.

**Probable Cause to Charge and Arrest Michael MCGIBBON and to Search His Residence at 7019 Glass Slipper Way, Citrus Heights, California**

170. On March 25, 2015, at approximately 12:26PM, VALDEZ TORRES received an incoming call over Target Telephone #1 from (916) 597-5216 (no subscriber information provided), utilized by Michael William McGIBBON. During the conversation, VALDEZ TORRES asked McGIBBON if he was home. McGIBBON affirmed. VALDEZ TORRES stated that he would be there in 30 minutes. McGIBBON agreed.

171. Based on my training, experience, and knowledge of this investigation, I believe that McGIBBON asked VALDEZ TORRES to supply him with an unknown quantity and type of drug merely by placing a call to VALDEZ TORRES. I believe that McGIBBON ordered the same amount and type of drug on a frequent and consistent basis and therefore did not have to specify the type and quantity of drug. I believe that VALDEZ TORRES advised McGIBBON that his runner would deliver the drugs in approximately 30 minutes.

172.    At approximately 12:34PM, VALDEZ TORRES placed an outgoing call to his
Sacramento runner at that time, MARTIN.  During the conversation, VALDEZ TORRES asked
MARTIN if MARTIN remembered "Banquita".  MARTIN affirmed.  VALDEZ TORRES told MARTIN
to stop by there.  VALDEZ TORRES stated that it would be like the one from the store.  VALDEZ
TORRES told MARTIN to send a text once MARTIN was in the area that way he could let the guy
(McGIBBON) know.  MARTIN asked if it would be at his (McGIBBON's) house.  VALDEZ TORRES
affirmed.

173.    Based on my training, experience, and knowledge of this investigation, I believe
that VALDEZ TORRES asked MARTIN if MARTIN remembered who "Banquita" was.  I believe
that VALDEZ TORRES refers to McGIBBON as "Banquita" (translation: bench) because located
directly in front of McGIBBON's house, near the sidewalk and behind a fence, is a bench.  I
believe that VALDEZ TORRES advised MARTIN to deliver the same quantity and type of drug
that William WELCH (referred to as "Burlington" or "store") normally receives when telling
MARTIN that it would be like one from the "store".  I believe that MARTIN confirmed that he
should deliver the drugs to McGIBBON's residence.

**Identification of McGIBBON as the User of 916-597-5216**

174.    At approximately 1:05PM, agents established surveillance at 7019 Glass Slipper
Way, Citrus Heights, California, the residence of McGIBBON.  Agents observed McGIBBON
standing outside of his residence.  At approximately 1:14PM, I placed an outgoing call to (916)
597-5216, utilizing an undercover phone.  At the same time, SA Montserrat observed
McGIBBON answer the phone, talk briefly, and hang up the cell phone.

**Drug Delivery to McGIBBON**

175.    At approximately 1:23PM, SA Montserrat observed a white Ford pickup identical
in appearance to the 1996 Ford pickup (CA#09485R1) utilized by members of the VALDEZ
TORRES DTO, arrive at 7019 Glass Slipper Way.  SA Montserrat observed McGIBBON walk to the
Ford pickup, which was stopped in the street.  Moments later, SA Montserrat observed the
white Ford pickup depart the area.  Agents were unable to view the license plate of the white
Ford pickup during this transaction.

176.    At approximately 1:26PM, VALDEZ TORRES placed an outgoing text message to MARTIN which stated, "Did you stop by yet?" I believe that VALDEZ TORRES wanted to know if MARTIN completed the drug delivery to McGIBBON. MARTIN responded with a text message that stated, "Ya". VALDEZ TORRES replied "Ok".

177.    At approximately 2:48PM, VALDEZ TORRES placed an outgoing text message to MARTIN which stated, "How much did Bankita give you?" MARTIN responded, "2.800". I believe that VALDEZ TORRES asked MARTIN how much money (drug proceeds) McGIBBON gave MARTIN. I believe that MARTIN informed VALDEZ TORRES that McGIBBON gave him $2,800.00. Based on my training and experience and familiarity with the current price of drugs, I believe that McGIBBON received ½ pound to 1 pound of methamphetamine. The current street price of methamphetamine in the Sacramento area is approximately $4,000.00 per pound. I believe that McGIBBON either received a ½ pound of methamphetamine and paid extra for a past drug debt, or McGIBBON received one pound of methamphetamine and did not pay the entire amount.

**McGIBBON Orders One Pound of Methamphetamine on June 3rd**

178.    On June 3, 2015, at approximately 1:45PM, VALDEZ TORRES received an incoming call from McGIBBON. During the conversation, VALDEZ TORRES asked McGIBBON if McGIBBON was home. McGIBBON affirmed that he was home. VALDEZ TORRES said that he would call McGIBBON back.

179.    At approximately 1:46PM, VALDEZ TORRES placed an outgoing call to McGIBBON. During the conversation, VALDEZ TORRES told McGIBBON that he (his runner) was a little far and will be back between 3 and 4. VALDEZ TORRES told McGIBBON to call VALDEZ TORRES back at around 3 or VALDEZ TORRES will call McGIBBON.

180.    Intercepted conversations indicated that VALDEZ TORRES' runner, GOMEZ, was on his way to deliver drugs to Shannon ARMSTRONG in El Dorado Hills. I believe that VALDEZ TORRES advised McGIBBON that it would be awhile before GOMEZ could make a drug delivery to McGIBBON.

181.    At approximately 3:58PM, VALDEZ TORRES sent an outgoing text message to
GOMEZ which stated, "How much time does Banquita want?" I believe that VALDEZ TORRES
was asking GOMEZ how much time before GOMEZ could deliver to McGIBBON.

182.    At approximately 3:59PM, VALDEZ TORRES received an incoming text message
from GOMEZ which stated, "I am arriving right now for the tools". I believe that GOMEZ
informed VALDEZ TORRES that he was arriving at the stash location to pick up the supply of
drugs for McGIBBON. I believe that GOMEZ used the term "tools" to refer to the drugs.

183.    Geolocation data for (916) 298-3163, the cellular telephone used by GOMEZ,
indicated that at approximately 4:02PM, GOMEZ was located at or near 9190 Tuolumne Drive
#29, Sacramento, California, believed to be the location where members of the VALDEZ TORRES
DTO stores drugs and drug proceeds.

184.    At approximately 4:54PM, GOMEZ sent VALDEZ TORRES a text message which
stated, "I will arrive in like 20 min and traffic". I believe that GOMEZ informed VALDEZ TORRES
that he would arrive at McGIBBON's residence in approximately 20 minutes.

185.    At approximately 5:10PM, SA Bersamina observed a grey Chrysler minivan,
identical to the 2004 grey Chrysler minivan (CA#09485R1) utilized by GOMEZ, drive away from
the direction of 7019 Glass Slipper Way, Citrus Heights. SA Bersamina was unable to confirm
the license plate of the minivan. SA Bersamina observed that the Chrysler minivan was driven
by a Hispanic male adult wearing a white t-shirt. Earlier that day, pursuant to the surveillance
of another drug transaction with Shannon ARMSTONG, SA Bersamina observed GOMEZ driving
the grey Chrysler minivan (CA#09485R1) and wearing a white t-shirt.

186.    At approximately 5:11PM, SA Martinez observed that the grey Chrysler minivan
was parked in the cul-de-sac a few houses away from 7019 Glass Slipper Way. At
approximately 5:12PM, SA Martinez observed the grey Chrysler minivan depart the area. At
approximately 5:15PM, SA Martinez drove down Glass Slipper Way and observed McGIBBON
standing in the middle of the cul-de-sac bending over a mini motorcycle. McGIBBON appeared
to be working on the engine of the mini motorcycle. SA Martinez continued driving and
observed McGIBBON driving towards 7019 Glass Slipper Way.

187.    At approximately 5:10PM, VALDEZ TORRES received an incoming text message from GOMEZ which stated, "It's done". I believe that GOMEZ informed VALDEZ TORRES that he completed the drug delivery to McGIBBON.

188.    At approximately 5:21PM, VALDEZ TORRES placed an outgoing call to GOMEZ. During the conversation, VALDEZ TORRES asked if "Banquita" was done. GOMEZ affirmed. VALDEZ TORRES said that was good and that he would call later. I believe that VALDEZ TORRES confirmed with GOMEZ that GOMEZ completed the drug delivery to McGIBBON ("Banquita").

**Probable Cause to Charge and Arrest Leonel VALDEZ AYON for Arranging a June 9th Drug Delivery**

189.    On June 9, 2015, at approximately 11:55PM, VALDEZ TORRES engaged in a lengthy conversation with UM1633, one of his sources of supply in Mexico, at Mexico telephone number 52-6961084380. During the conversation, VALDEZ TORRES told UM1633 that he was running low (on drugs) and asked UM1633 to send out a supply of drugs. UM1633 asked VALDEZ TORRES to check the number (money) because UM1633 had been told that VALDEZ TORRES needed to send some money from a previous shipment of drugs. UM1633 asked how much (money) was there. VALDEZ TORRES stated that he might be able to put a "ciego". I believe "ciego" is a play on the word "cien", which is Spanish for one hundred. (Based on my training, experience, and knowledge of this investigation, I believe that VALDEZ TORRES stated that he thought he had $100.000.00 of drug proceeds. UM1633 told VALDEZ TORRES to put 70 ($70,000). VALDEZ TORRES said that he would check that and thought there would be no problem. Later in the conversation, VALDEZ TORRES asked UM1633 if he had the "relative's" number (phone number). UM1633 asked VALDEZ TORRES to give him the number so UM1633 could give it to the old lady and she could head out that way. VALDEZ TORRES said that whatever UM1633 said, that was what would be going out ($70,000). UM1633 again told VALDEZ TORRES to send the number so they could head out that way.

190.    At approximately 12:13PM, VALDEZ TORRES sent an outgoing text message to UM1633 which stated, "661 927 85 66". I believe that VALDEZ TORRES gave UM1633 the phone number (661) 927-8566, utilized by VALDEZ AYON, because VALDEZ AYON would be the individual who would deliver the $70,000 of drug proceeds to UM1633's associate/runner ("the old lady").

191.    Telephone toll records for (661) 927-8566 indicated that at approximately 7:34PM, VALDEZ AYON received an incoming call from telephone number (626) 454-9413.

192.    Approximately one minute later, at approximately 7:35PM, VALDEZ TORRES received an incoming call from VALDEZ AYON, who said that some guy was there asking him about some "ticket". VALDEZ TORRES said that he have given the number to the guy that was out there. VALDEZ TORRES asked if VALDEZ AYON thought the guy would be far. VALDEZ AYON said that he didn't know and that the guy did not say anything. VALDEZ TORRES told VALDEZ AYON to give the guy "7 tacos". VALDEZ AYON confirmed if it was 7. VALDEZ affirmed and stated, "7 burros". VALDEZ TORRES said that he told "Wacho" that it would only be "6" so VALDEZ AYON should give him the 6 and just put one more there. VALDEZ AYON asked if he had to check it or what. VALDEZ TORRES said no. VALDEZ TORRES told VALDEZ AYON to tell the guy that he would be taking it to him.

193.    Based on my training, experience, and knowledge of this investigation, I believe that VALDEZ AYON contacted VALDEZ TORRES to verify that an individual was supposed to be calling VALDEZ AYON about delivering drug proceeds. I believe that VALDEZ AYON used the term "ticket" to refer to drug proceeds. I believe that VALDEZ TORRES confirmed that he had given VALDEZ AYON's number to UM1633 who is in Mexico ("the guy that was out there"). I believe that VALDEZ TORRES told VALDEZ AYON to give the courier $70,000 when using the term "7 tacos" and "7 burros". I further believe that VALDEZ TORRES told VALDEZ AYON that the amount of drug proceeds MARTINEZ-CARRANZA ("Wacho") had was only $60,000. (Intercepted conversations and surveillance indicated that MARTINEZ-CARRANZA traveled to Sacramento on June 7, 2015, and delivered a supply of drugs. MARTINEZ-CARRANZA traveled back to Delano on June 8, 2015, after receiving "6 burritos" from GOMEZ to transport back to Delano. Thus, I believe that GOMEZ received $60,000.00 of drug proceeds from GOMEZ.) I believe that VALDEZ TORRES told VALDEZ AYON to give the courier the $60,000.00 that MARTINEZ-CARRANZA just received from GOMEZ and to add another $10,000.00 ("put one more there") to make it a total of $70,000.00. I believe that VALDEZ TORRES told VALDEZ AYON to contact the courier and let the courier know that VALDEZ AYON would be bringing him the $70,000.00 of drug proceeds.

194.     Telephone toll records for (661) 927-8566 indicated that at approximately 7:34PM, VALDEZ AYON placed an outgoing call to telephone number (626) 454-9413. Toll records also indicated that VALDEZ AYON received one more an incoming call from (626) 454-9413 at approximately 10:21PM.

195.     On June 10, 2015 at approximately 10:55AM, VALDEZ TORRES placed an outgoing call to VALDEZ AYON. VALDEZ TORRES asked VALDEZ AYON if he had called him. VALDEZ AYON stated that he called VALDEZ TORRES to let him know that VALDEZ AYON saw the guy at 10 or 10:15 so that VALDEZ TORRES could call the other guy but VALDEZ TORRES did not answer (the phone). VALDEZ TORRES said that he would send the guy a message. VALDEZ AYON told VALDEZ TORRES to send it (the message). VALDEZ TORRES asked VALDEZ AYON if it was the "7 burros". VALDEZ AYON affirmed. VALDEZ TORRES stated that he would send the message right now.

196.     Based on my training, experience, and knowledge of this investigation, I believe that VALDEZ AYON advised VALDEZ TORRES that he had been trying to contact him to let him know that VALDEZ AYON met with the courier the previous night at approximately 10:00-10:15PM so that VALDEZ TORRES could inform UM1633 that the transaction had been completed. I believe that VALDEZ TORRES stated that he would send UM1633 ("the guy") a message. I believe that VALDEZ TORRES confirmed that VALDEZ AYON delivered $70,000.00 ("7 burros") to UM1633's courier the previous night.

197.     At approximately 10:57AM, VALDEZ TORRES sent an outgoing text message to UM1633 which stated, "Hey man, LEON said hello to the old lady, 70." Based on the foregoing and on my training, experience, and knowledge of this investigation, I believe that VALDEZ TORRES advised UM1633 that VALDEZ AYON had in fact delivered $70,000 to UM1633's courier.

**Probable Cause to Charge and Arrest Leonel VALDEZ AYON, GOMEZ, and MARTINEZ-CARRANZA**

198.     On June 13, 2015, VALDEZ TORRES arranged to obtain a supply of drugs from one of his sources of supply in Mexico. VALDEZ TORRES then arranged for one of his drug runners/couriers, Leobardo MARTINEZ-CARRANZA, to travel to Hesperia, California, to pick up

51

the supply of drugs, deliver drug proceeds, and transfer the drugs back to Delano, California. On June 15, 2015, VALDEZ TORRES arranged for MARTINEZ-CARRANZA to transport part or all of the supply of drugs that he just obtained in Hesperia to Sacramento, California. VALDEZ TORRES then arranged for VALDEZ AYON to prepare the drugs in load vehicles for MARTINEZ-CARRANZA to transport to Sacramento. Later that day, MARTINEZ-CARRANZA transported the drugs to Sacramento. On June 16, 2015, MARTINEZ-CARRANZA transferred the drugs to Roberto GOMEZ in Sacramento. GOMEZ then transported to drugs to the residence located at 9190 Tuolumne Drive #29, Sacramento, where he processed the drugs. GOMEZ then counted and packaged the drug proceeds for MARTINEZ-CARRANZA to transport back to Delano.

199.    On June 13, 2015, between approximately 4:58PM and 5:13PM, VALDEZ TORRES utilized Target Telephone #4 to exchanged text messages with Mexico telephone number 52-6673336308, utilized by one of VALDEZ TORRES' sources of supply, an unidentified male, known as UM6308. Specifically, UM6308 texted VALDEZ TORRES: "4422299259 with Gabylan from Arqui. Call him and come to an agreement." Based on my training, experience, and knowledge of this investigation, I believe that UM6308 texted VALDEZ TORRES the phone number and name of the individual who had a supply of drugs for VALDEZ TORRES. I further believe that UM6308 instructed VALDEZ TORRES to contact "Gabylan/Gavilan" (hereinafter referred to as GAVILAN) at telephone number (442) 229-9259, to tell GAVILAN that VALDEZ TORRES was calling on behalf of ARQUI. I believe that UM6308 instructed VALDEZ TORRES to call GAVILAN to arrange for the transfer the drugs ("come to an agreement").

200.    At approximately 5:26PM, VALDEZ TORRES utilized Target Telephone #5 to place an outgoing call to (442) 229-9259 (Subscriber: Unknown), utilized by GAVILAN. VALDEZ TORRES said, "I'm calling on behalf of Arqui." GAVILAN responded, "All right. Yes, I was told." And VALDEZ TORRES continued, "I'm going to send the guy over there. It's just that the guy is going to make like – I think that [unintelligible], relative. Because, because the guys is still far away." GAVILAN then indicated that he was "going to be over by the city of Hesperia" which is "by the fifteen going toward – by the fifteen heading up. There in Ontario by the fifteen, going up." VALDEZ TORRES indicated he would drive over to GAVILAN, who said, "Call me when you

are close by there." VALDEZ TORRES then said, "I'm going to send a guy then, then, um, he can call you there, there so you guys can arrange it."

201.    Based on the foregoing conversation and my training, experience, and knowledge of this investigation, I believe that VALDEZ TORRES contacted GAVILAN soon after receiving his telephone number from UM6308. I believe that VALDEZ TORRES told GAVILAN that he (VALDEZ TORRES) was calling on behalf of "Arqui", the individual responsible for the supply of drugs. I believe that VALDEZ TORRES advised GAVILAN that he (VALDEZ TORRES) was going to send his runner to meet with GAVILAN to obtain the supply of drugs. I believe that GAVILAN advised VALDEZ TORRES that he (GAVILAN) was located in the city of Hesperia. VALDEZ TORRES and GAVILAN discussed directions on where Hesperia, California was located. I believe that VALDEZ TORRES then advised GAVILAN that he would send his runner ("I'm going to tell him to head that way"). I believe that VALDEZ TORRES stated that his runner would contact GAVILAN when he was on his way to see GAVILAN.

202.    At approximately 5:33PM, VALDEZ TORRES utilized Target Telephone #5 to place an outgoing call to GAVILAN. VALDEZ TORRES and GAVILAN said the following:

| VALDEZ TORRES | I don't know if they told you there so that, to see if you can do me the favor there [stutters] if they are there, if [stutters] the guy is dirty so that you could change him. |
| GAVILAN | How? |
| VALDEZ TORRES | So you can change it. So that you can, can give it a little change there so it won't have [unintelligible]. |
| GAVILAN | Oh a small change? Like you want me to prepare it there so that it does not smell. |
| VALDEZ TORRES | Yeah, just like when you grease or clean shoes. |
| GAVILAN | Oh! I, I'll do you the favor. I'll put something there. |
| VALDEZ TORRES | Jus, just please, if you, if you [stutters] put it like a type of burro. |
| GAVILAN | Oh! Yes, yes, yes. Don't worry. I'll make it that way. |
| VALDEZ TORRES | Okay thank you. |

203.    Based on the foregoing conversation and my training, experience, and
knowledge of this investigation, I believe that VALDEZ TORRES asked if GALIVAN could
repackage the drugs if the smell was detectable when stating, "the guy is dirty so that you could
change him." I believe that VALDEZ TORRES asked GALIVAN to place something inside the
packages of drugs (i.e., oil, grease) so that the drugs would not smell. I believe that VALDEZ
TORRES also asked GAVILAN to package the drugs in a certain shape (possibly oblong in shape)
when asking to put it like a "burro" (translation: donkey). "Burro" could be used as short-term
for "burrito", as previously intercepted conversations indicated that VALDEZ TORRES frequently
used the term "burrito" to refer to his supply of drugs and how the drugs are packaged.
Therefore, I believe that VALDEZ TORRES asked GAVILAN to package the drugs in an oblong
shape, like the shape of a burrito, so that the drugs would fit inside a hidden compartment for
transport of the drugs.

204.    At approximately 5:42PM, VALDEZ TORRES placed an outgoing text message to
telephone number (661) 792-8425 (Subscriber: Selene VALDEZ), utilized by Leobardo
MARTINEZ-CARRANZA, which stated, "Gabilan 442 229 92 59 on behalf of Arki". Based on my
training, experience, and knowledge of this investigation, I believe that MARTINEZ-CARRANZA is
VALDEZ TORRES' runner who would pick up the supply of drugs from GAVILAN. I believe that
VALDEZ TORRES gave MARTINEZ-CARRANZA GAVILAN's telephone number so that MARTINEZ-
CARRANZA could contact GAVILAN and coordinate the drug meeting.

205.    At approximately 5:46PM, VALDEZ TORRES received an incoming call from
MARTINEZ-CARRANZA. Based on my training, experience, and knowledge of this investigation, I
believe that during this call VALDEZ TORRES told MARTINEZ-CARRANZA to depart Delano to pick
up the supply of drugs when he said "...now you can leave quite calmly". I also believe that
MARTINEZ-CARRANZA asked if the runner (GAVILAN) had MARTINEZ-CARRANZA's phone
number. I believe that VALDEZ TORRES advised MARTINEZ-CARRANZA to keep GAVILAN's
phone number and to contact GAVILAN when MARTINEZ-CARRANZA arrived closer to Hesperia.
I believe that VALDEZ TORRES gave MARTINEZ-CARRANZA directions for where to meet
GAVILAN (in Hesperia). I believe that VALDEZ TORRES instructed MARTINEZ-CARRANZA to

contact VALDEZ TORRES when MARTINEZ-CARRANZA was close to Hesperia so VALDEZ TORRES could let GAVILAN know when to expect MARTINEZ-CARRANZA's call. I believe that VALDEZ TORRES told MARTINEZ-CARRANZA to then call GAVILAN directly to coordinate the drug meeting.

206.    Between approximately 7:21PM and 8:40PM, VALDEZ TORRES and MARTINEZ-CARRANZA engaged in several conversations over Target Telephone #4, in which MARTINEZ-CARRANZA clarified directions and appeared to be in route to Hesperia, California. During a call at 8:40PM, VALDEZ TORRES informed MARTINEZ-CARRANZA that he (VALDEZ TORRES) would call the guy to let him know that MARTINEZ-CARRANZA would be calling. VALDEZ TORRES told MARTINEZ-CARRANZA to let the guy know where MARTINEZ-CARRANZA was located and that the guy's name was "El Gavilan". VALDEZ TORRES reiterated that he (VALDEZ TORRES) would call GAVILAN to let him know that MARTINEZ-CARRANZA was close by. VALDEZ TORRES told MARTINEZ-CARRANZA to call GAVILAN in 5 minutes.

207.    At 8:43PM, VALDEZ TORRES placed an outgoing call to GAVILAN. VALDEZ TORRES and GAVILAN engaged in the following conversation:

| VALDEZ TORRES | The young man is going to call you there, there [stutters]. He is getting on [stutters] the one you told me there. There by, close so that – you can give him instructions there. |
| GAVILAN | All right, I'll – I'm there, I might send a guy so that he meets with him. Me too – I'll arrange it there with him, I'll wait for him here. |
| VALDEZ TORRES | Yes, yes right now [stutters] he is going to call. |
| GAVILAN | It was the number one, right? So I can give him the tools. |
| VALDEZ TORRES | Uh...yes, the the one and the zero. |
| GAVILAN | All right then. We'll be here. |
| VALDEZ TORRES | All right then. Bye. |

208.    Based on the foregoing and on my training, experience, and knowledge of this investigation, I believe that VALDEZ TORRES advised GAVILAN that MARTINEZ-CARRANZA would be arriving soon and that GAVILAN could tell MARTINEZ-CARRANZA where to meet. I believe

55

that GAVILAN stated that he may send another runner to meet with MARTINEZ-CARRANZA. I further believe that GAVILAN confirmed with VALDEZ TORRES that he was supposed to give MARTINEZ-CARRANZA the supply of drugs when asking, "So I can give him the tools?" I believe that VALDEZ TORRES affirmed and stated that MARTINEZ-CARRANZA would receive 10 units of drugs ("the one and the zero").

209.    At approximately 9:22PM, VALDEZ TORRES received an incoming call from MARTINEZ-CARRANZA. VALDEZ TORRES and MARTINEZ-CARRANZA engaged in the following conversation:

| VALDEZ TORRES | Hello |
|---|---|
| MARTINEZ-CARRANZA | How many hamburgers?  How many were the ones I had with me? |
| VALDEZ TORRES | They were diego, they were diego. |
| MARTINEZ-CARRANZA | Yes, but there were three, were three of these, right? |
| VALDEZ TORRES | Yes. |
| MARTINEZ-CARRANZA | Oh well.  All right then. |

210.    Based on my training, experience, and knowledge of this investigation, I believe that MARTINEZ-CARRANZA wanted to verify how much money he was going to give to GAVILAN when asking, "How many were the ones I had with me?" I believe that MARTINEZ-CARRANZA also used the term "hamburgers" to refer to the bundles of money (3 bundles). I believe that VALDEZ TORRES mistakenly thought the MARTINEZ-CARRANZA was asking how many units of drugs MARTINEZ-CARRANZA would obtain from GAVILAN and therefore replied, "diego". I believe that VALDEZ TORRES used the term "diego" to refer to 10 units of drugs.

211.    At approximately 9:23PM, VALDEZ TORRES received and incoming call from MARTINEZ-CARRANZA. VALDEZ TORRES and MARTINEZ-CARRANZA engaged in the following conversation:

| MARTINEZ-CARRANZA | Cousin. |
|---|---|
| VALDEZ TORRES | What happened? |
| MARTINEZ-CARRANZA | Jus-Just, it was ten, the, the ones I had to grab, right? |

| | |
|---|---|
| VALDEZ TORRES | There were diego. There were diego. |
| MARTINEZ-CARRANZA | No, he said he only had one. |
| VALDEZ TORRES | Huh? |
| MARTINEZ-CARRANZA | That he only brought one. |
| VALDEZ TORRES | No, tell him that there are diego! |
| MARTINEZ-CARRANZA | Okay.  All right then I'll let him know. |
| VALDEZ TORRES | Tell him that there are diego. |
| MARTINEZ-CARRANZA | All right then – [voices overlap]. |
| VALDEZ TORRES | Listen. |
| MARTINEZ-CARRANZA | Huh? |
| VALDEZ TORRES | Tell him, tell him that there are diego and [stutters] the real pure not fucking – none of that shit, tell him just fifty caliber. |
| MARTINEZ-CARRANZA | Yes, well he said that [stutters] that I was going to follow him, that I am going to follow him. |
| VALDEZ TORRES | Yes, but tell him that just, just, just pure, good, just [stutters] that you don't want to – for you to do too much, so that the car doesn't get dirty from dust, tell him. |
| MARTINEZ-CARRANZA | Okay, wait, wait. |
| VALDEZ TORRES | Old man!  Hey! [Long pause].  Old man! [Long pause]. |
| MARTINEZ-CARRANZA | Relative. |
| VALDEZ TORRES | Tell me. |
| MARTINEZ-CARRANZA | I came to tell the guy here but [unintelligible]. |
| VALDEZ TORRES | What? |
| MARTINEZ-CARRANZA | He says that they told him that there was only one that |

57

| | this and that. |
|---|---|
| VALDEZ TORRES | No, tell him, tell him that there were diego and that – [stutters] tell him that there were diego and only the good stuff that you don't want any to be mistreated. |
| MARTINEZ-CARRANZA | And, and there are twenty-six, right? What's [unintelligible] |
| VALDEZ TORRES | Yes. |
| MARTINEZ-CARRANZA | Oh well, it was three hamburgers, right? |
| VALDEZ TORRES | Yes. |
| MARTINEZ-CARRANZA | Oh, well that's fine. I'll tell him right, right now. |
| VALDEZ TORRES | Yes, tell him the way I told you before he takes it back. Tell him, tell him that there were diego, but tell him that only good stuff. That you don't' want [stutters] any mistreated one. |
| MARTINEZ-CARRANZA | Yeah, yeah. I'll arrange that right, right now. |
| VALDEZ TORRES | All right then. Just [stutters] tell him that is very important, old man, so that it's not a waste of time. |
| MARTINEZ-CARRANZA | How? |
| VALDEZ TORRES | Just tell him that. Tell him what I'm telling you because it's very important. |
| MARTINEZ-CARRANZA | Yeah, no, yes, yes. Right now I'll [stutters] I'm going to [unintelligible] [voices in the background]. |
| VALDEZ TORRES | All right then. |
| MARTINEZ-CARRANZA | All right then. |

212.   Based on my training, experience, and knowledge of this investigation, I believe that in the foregoing conversation MARTINEZ-CARRANZA verified that he was supposed to

obtain 10 units of drugs when asking, "… it was then, the the ones I had to grab, right?" I

believe that VALDEZ TORRES confirmed that it was 10 units when using the term "diego". I

know that drug traffickers often use the term "diego" to mean 10 because "diego" is play on

the Spanish word for ten, "diez". I believe that MARTINEZ-CARRANZA advised VALDEZ TORRES

that GAVILAN (or GAVILAN's runner) only brought 1 unit of drugs ("he only had one"). I believe

that VALDEZ TORRES told MARTINEZ-CARRANZA that there were supposed to be 10 units of

high quality drugs ("real pure; just fifty caliber"). I believe that MARTINEZ-CARRANZA indicated

that he would follow GAVILAN to another location to obtain the 10 units ("I am going to follow

him". I believe that VALDEZ TORRES reiterated to MARTINEZ-CARRANZA to make sure that the

10 units of drugs are of very high quality ("just pure, good") and that MARTINEZ-CARRANZA

should not travel far to obtain the drugs ("so that the car doesn't get dirty from dust"). I

believe that MARTINEZ-CARRANZA confirmed that he was supposed to receive 26 units,

possibly of a different type of drug ("there are 26, right?") I believe that MARTINEZ-CARRANZA

also confirmed that he was supposed to give GAVILAN drug proceeds that were packaged in 3

bundles when asking, "And there were 3 hamburgers, right?" I believe that VALDEZ TORRES

confirmed the amount of drug and the bundles of money but told MARTINEZ-CARRANZA to

make sure MARTINEZ-CARRANZA obtained ten, high quality units ("only good stuff") and not

low quality drugs ("don't want any mistreated one") of drugs.

    213.    At approximately 9:26PM, VALDEZ TORRES placed an outgoing call to GAVILAN.

VALDEZ TORRES and GAVILAN said the following:

| VALDEZ TORRES | Did the buddy, Arqui, tell you that it would be diego there? |
|---|---|
| GAVILAN | No, they hadn't told me, man. I did get confused with, with the other guy that was going to call for a disc. And um, I was confused but there is no problem the guy is behind me I'll give them to him right now. |
| VALDEZ TORRES | Oh no, yeah. I'm telling you well because the thing is that – with the buddy here that [stutters] told me that if it was messed up, for me to tell you so that [stutters] it can be pure, pure and real good. |

| GAVILAN | Well right now when the guy gets here to the house he can check it and you know well if – you can look at it. |
| VALDEZ TORRES | It's set then, just that, that – well, I just ask you that's all real good shit so that there's no issues with that crazy guy. |
| GAVILAN | Well I was going to give it to him like that how it was, just the way I got it right now. |
| VALDEZ TORRES | Oh. Ah!  All right then, it's fine there [stutters] just let him know. Bye |

214.    Based on my training, experience, and knowledge of this investigation, I believe that after VALDEZ TORRES spoke with MARTINEZ-CARRANZA, VALDEZ TORRES contacted GAVILAN to clarify the amount and quantity of the drugs given to MARTINEZ-CARRANZA. I believe that VALDEZ TORRES asked GAVILAN if ARQUI told GAVILAN that GAVILAN would be giving 10 units of drugs to VALDEZ TORRES. I believe that GAVILAN stated that he got confused because was supposed to give another person drugs ("I did get confused with, with the other guy..."). I believe that GAVILAN stated that he would give MARTINEZ-CARRANZA the 10 units of drugs. I believe that VALDEZ TORRES then told GAVILAN that he was promised high quality ("pure, real good") drugs. I believe that GAVILAN indicated that when MARTINEZ-CARRANZA arrived to the house to pick up the drugs, MARTINEZ-CARRANZA could look at the drugs and decide if he wanted it or not. I believe that GAVILAN indicated that the drugs were exactly the way they were when they arrived from Mexico ("how it was, just the way I got it right now").

215.    At approximately 10:22PM, VALDEZ TORRES received an incoming call from MARTINEZ-CARRANZA. VALDEZ TORRES and MARTINEZ-CARRANZA engaged in the following conversation, after discussing a few initial matters:

| VALDEZ TORRES | Okay then.  So are we on track? |
| MARTINEZ-CARRANZA | Yeah, on track, but not completely.  [Stutters] You'll see them in a while. |
| VALDEZ TORRES | Why?  What happened? |
| MARTINEZ-CARRANZA | The dog I got is really ugly. |

| VALDEZ TORRES | Okay drive slow and calm. |
| MARTINEZ-CARRANZA | Yes, the guy said that he didn't like them. He ripped the piñata open to count it. |
| VALDEZ TORRES | Yes. |
| MARTINEZ-CARRANZA | Okay then. I'll drive calmly. |
| VALDEZ TORRES | Are you on the two ten yet? |
| MARTINEZ-CARRANZA | What? |
| VALDEZ TORRES | Are you on the two ten yet? |
| MARTINEZ-CARRANZA | No, there is no two ten here. I am coming down, I don't know the name, but I already put it on the phone and it will take me all the way there. |
| VALDEZ TORRES | No, that way doesn't work. You should have taken the way you know. That way doesn't work |
| MARTINEZ-CARRANZA | No? |
| VALDEZ TORRES | No, it's too lonely. You want to come out by Bakersfield. By Bakersfield, right? The other way. |
| MARTINEZ-CARRANZA | I don't' know. I don't even know what way this is sending me. |
| VALDEZ TORRES | If you haven't gotten out of the town yet, go back the way you know. The way you took before. |
| MARTINEZ-CARRANZA | Ok, let me check. I can ask in a store because I took a street I don't know. I wanted to take [unintelligible]. |
| VALDEZ TORRES | No, what is going on is that you are taking the lonely way. The way you want to take is very lonely. |
| MARTINEZ-CARRANZA | Yeah, I traveled that way before. Once I traveled that way and it is lonely. |
| VALDEZ TORRES | No, that way doesn't work. |

216.    Based on my training, experience, and knowledge of this investigation, I believe that MARTINEZ-CARRANZA advised VALDEZ TORRES that he had completed the drug transaction and was traveling back with the supply of drugs. I believe that VALDEZ TORRES asked if MARTINEZ-CARRANZA obtained the correct supply of drugs when asking, "So are we on track?" I believe that MARTINEZ-CARRANZA affirmed that he received the drugs but stated that the drugs may not be of high quality when stating, "The dog I got is really ugly." I believe that MARTINEZ-CARRANZA was referring to the drugs when stating that it was "ugly". I believe that VALDEZ TORRES told MARTINEZ-CARRANZA to drive "slow and calm" because MARTINEZ-CARRANZA was transporting the supply of drugs. I believe that VALDEZ TORRES told MARTINEZ-CARRANZA to take a different route because the route that MARTINEZ-CARRANZA was currently taking was not busy enough ("lonely"). I believe that VALDEZ TORRES was concerned about the route being "lonely" because of the greater chance of being detected by law enforcement.

217.    A review of video surveillance revealed that on June 13, 2014, at approximately 1:34PM, a dark-colored sedan arrived at 2335 Venice Drive, Delano, California, believed to be a residence utilized to store drugs and drug proceeds. SA Zavala observed the garage door to the residence open immediately upon arrival of the dark-sedan. At approximately 1:36PM, SA Zavala observed a heavy-set male, wearing a light blue short-sleeved shirt and dark pants exit the front passenger seat of the dark sedan. The heavy-set male strongly resembled MARTINEZ-CARRANZA in build and stature. SA Zavala also observed VALDEZ TORRES, wearing a black t-shirt with a large white circle on the back, and khaki colored pants, exit the front passenger seat of the dark sedan. SA Zavala observed VALDEZ TORRES and MARTINEZ-CARRANZA walk into the garage. At approximately 1:48PM, SA Zavala observed a dark-grey minivan exit the garage and depart the area. At approximately 1:50PM, SA Zavala observed VALDEZ TORRES exit the garage, close the garage door manually from the outside, and enter the dark-colored sedan. VALDEZ TORRES departed in the dark-colored sedan at approximately 1:56PM. I believe that VALDEZ TORRES gave MARTINEZ-CARRANZA possession of the grey-minivan to utilize to travel to Hesperia, California for the purpose of transporting a supply of drugs.

218.    On June 14, 2015, at approximately 2:03AM, a dark-colored vehicle arrived and parked in front of the residence located at 220 Avenue Castro, Delano, California. Subsequent video footage during daylight hours revealed that the vehicle was a grey minivan. A search of Google maps indicated that the driving distance between Hesperia, California and Delano, California is approximately 3 hours. Pursuant to the above intercepted telephone calls, MARTINEZ-CARRANZA departed Hesperia at approximately 10:15PM. Intercepted conversations indicated that MARTINEZ-CARRANZA had change routes after taking the wrong freeway. Therefore, I believe that at approximately 2:03AM, MARTINEZ-CARRANZA arrived in Delano, California, with the supply of drugs. I believe that MARTINEZ-CARRANZA transported the drugs in a grey minivan (believed to be a 2004 grey Chrysler minivan, California license plate #6JSM020) and upon returning to Delano, parked the van containing the supply of drugs in front of VALDEZ AYON's residence, located at 220 Avenue Castro, Delano, California.

219.    On June 14, 2015, at approximately 12:46PM, VALDEZ TORRES received an incoming call from MARTINEZ-CARRANZA. MARTINEZ-CARRANZA asked VALDEZ TORRES if the truck was with VALDEZ AYON. MARTINEZ-CARRANZA asked if VALDEZ TORRES had seen the truck. VALDEZ TORRES said that he had not seen the truck. MARTINEZ-CARRANZA said that he had left the truck with VALDEZ AYON. VALDEZ TORRES said that he had not seen or talked with VALDEZ AYON. MARTINEZ-CARRANZA said that he had called VALDEZ AYON but he had not answered. MARTINEZ-CARRANZA stated that he would call VALDEZ TORRES later. Based on my training, experience, and knowledge of this investigation, I believe that MARTINEZ-CARRANZA advised VALDEZ TORRES that he had parked the grey van ("truck") containing the drugs at VALDEZ AYON's house.

220.    On June 14, 2015, between approximately 1:55PM and 1:57PM, VALDEZ TORRES exchanged text messages with MARTINEZ-CARRANZA. Based on my training, experience, and knowledge of the investigation, I believe that MARTINEZ-CARRANZA asked VALDEZ TORRES if MARTINEZ-CARRANZA would make a drug-related trip that day ("go to the coffee") or the following day ("tomorrow"). I also believe that VALDEZ TORRES advised MARTINEZ-CARRANZA that he (MARTINEZ-CARRANZA) would not make the trip until the following day.

221.    On June 15, 2015, VALDEZ TORRES received an incoming text message from Mexico telephone number 52-6673336308 (Subscriber: Unknown), utilized by UM6308, which stated: "Good morning good we're just here. Yes, my aunt told me yesterday that she left the 26."

222.    Based on my training, experience, and knowledge of this investigation, I believe that UM6308 verified that GAVILAN ("my aunt") delivered the 26 units of drugs the previous day. I believe that VALDEZ TORRES and his co-conspirators used the term "aunt" ("tia") to refer to drugs and/or the person who delivers the drugs.

223.    Between approximately 1:03PM and 1:07PM, VALDEZ TORRES exchanged text messages with MARTINEZ-CARRANZA in which VALDEZ TORRES advised MARTINEZ-CARRANZA that he (MARTINEZ-CARRANZA) would travel to Sacramento, California to deliver a supply of drugs and transport drug proceeds back to Delano. When VALDEZ TORRES said, "Get ready so you can greet Beto later," I believe that VALDEZ TORRES was referring to Roberto GOMEZ, the Sacramento runner, because "Beto" is a common nickname for "Roberto". And when VALDEZ TORRES said, "Ah, well tell Leon that way he can be ready," I believe that MARTINEZ-CARRANZA told VALDEZ TORRES to tell VALDEZ AYON (a.k.a. "Leon") so that VALDEZ AYON would be ready because VALDEZ AYON would arrange and prepare the drugs for transport inside the load vehicle.

224.    At approximately 5:11PM, VALDEZ TORRES received an incoming call from (661) 927-8566 (Subscriber: Jenni Lopez, McFarland, CA), utilized by VALDEZ AYON. Based on my training, experience, and knowledge of this investigation, I believe that during this conversation VALDEZ AYON asked VALDEZ TORRES what time MARTINEZ-CARRANZA would take the drug-related trip ("at what time is the guy going upstairs?"). I believe that VALDEZ TORRES advised VALDEZ AYON that MARTINEZ-CARRANZA was leaving soon, around 6:30PM. I believe that VALDEZ AYON asked VALDEZ TORRES to tell MARTINEZ-CARRANZA not to park at VALDEZ AYON's house because VALDEZ AYON did not want to attract attention to his house.

225.    At approximately 5:28PM, VALDEZ TORRES received an incoming call from GOMEZ. GOMEZ said, "I wanted to let you know that I'm at the small apartment fixing the tools to leave. We are exactly at avenue number two and right now I'm going to get some more

64

ready for what I'm going to keep."  GOMEZ also indicated that "Almost half of it [stutters] almost half of the box is fine, but the other half is really ugly."  They continued:

| VALDEZ TORRES | Oh, then put it, when you see it like that put it, no just leave it because in a little while I'm going to say hello to the crazy dude. |
| --- | --- |
| GOMEZ | Okay. |
| VALDEZ TORRES | And mark it and when you get a chance put it on the thing for it to go through, but I don't think it will go through because I believe that the other guy did that already.  But try to put it through the colander, but not until everything else is ready – [voices overlap]. |
| GOMEZ | How? |
| VALDEZ TORRES | But try to put it though the colander, but not until everything else is ready – [voices overlap]. |
| GOMEZ | Okay.  That's fine. |
| VALDEZ TORRES | In a while, the guy will get there to say hello so be ready [voices overlap]. |
| GOMEZ | Okay.  That's fine.  Yeah, because to do alright there is what it is, like the stuff from Burlington and maybe a could fit one like in the house of rock and the rest will be just the crushed stuff. |
| VALDEZ TORRES | Okay.  That is why I'm telling you to put it through the thing and if it goes through – [voices overlap]. |
| GOMEZ | Okay.  That's fine. |
| VALDEZ TORRES | But do it when the other dudes get there so that everyone can check it out. |

65

| | |
|---|---|
| GOMEZ | Okay. That's fine – [voices overlap]. |
| VALDEZ TORRES | Check it every time you take it to Venado. Make sure it doesn't go like that and he'll return it. |
| GOMEZ | No, the part for Venado is not good right there a little but, but what is not like that no because you see – [voices overlap]. |
| VALDEZ TORRES | Okay. |
| GOMEZ | It has a little bit of the ugly one, but only a little. It is ready and it looks good. In fact, for his part we are at avenue number one. |
| VALDEZ TORRES | Okay. |
| GOMEZ | And the rest, right now I'm just checking the tools – [voices overlap]. |
| VALDEZ TORRES | Okay. |
| GOMEZ | I'll leave with me – [voices overlap]. |
| VALDEZ TORRES | Okay. |
| GOMEZ | There is only two big trees left. |
| VALDEZ TORRES | Okay, that's fine. Well then I will ask of you that. Well if you want there is [mumbles] the insurance that it has, it has to say right there when – [voices overlap]. |
| GOMEZ | Okay. |
| VALDEZ TORRES | You can do there, what to do. |
| GOMEZ | Okay, that is fine. And the other guy is coming here later, then? |
| VALDEZ TORRES | God willing. |
| GOMEZ | Okay. That is fine. |

| VALDEZ TORRES | Leave some out. So you'll have some out. |
| GOMEZ | Okay. That is fine – [voices overlap]. |
| VALDEZ TORRES | [Unintelligible]. |
| GOMEZ | I also wanted to let you know, how? |
| VALDEZ TORRES | Yeah, you should leave some out so that if later the lazy guy calls, right there Yonk and Flaco so they can see it. |
| GOMEZ | Okay – [voices overlap]. |
| VALDEZ TORRES | [Unintelligible]. |
| GOMEZ | What? |
| VALDEZ TORRES | Check if there is insurance and send me a little message. |
| GOMEZ | Okay, that is fine. And with what is for Yonke we are at the avenue number 8. |

226.    Based on my training, experience, and knowledge of this investigation, I believe that during the foregoing conversation GOMEZ informed VALDEZ TORRES that he was at the stash location ("the small apartment") preparing/packaging the drugs ("fixing the tools") for distribution ("to leave"). Geolocation data for GOMEZ's cellular telephone indicated that GOMEZ was at/near the residence 9190 Tuolumne Drive, Sacramento, California.[8] I believe that GOMEZ advised VALDEZ TORRES that he had two units of drugs left ("avenue number two") and that GOMEZ was getting a supply of drugs ready to take with him ("get some ready for what I'm going to keep"). I believe that GOMEZ stated that one unit of drug ("avenue number one") was ready to be distributed but that GOMEZ still needed to prepare/package another unit. I believe that GOMEZ advised VALDEZ TORRES that one unit of drug was of poor quality ("very, very crushed", "very ugly"). I believe that VALDEZ TORRES instructed GOMEZ to fix the poor quality drug by cleaning it ("put it through the colander"). I believe that VALDEZ TORRES advised GOMEZ that MARTINEZ-CARRANZA would arrive soon ("the guy will get there to say hello"). I believe that VALEZ TORRES told GOMEZ not to give poor quality drugs to their sub-distributor,

---

[8] At this point the geolocation information was accurate to a certainty of 835 meters.

Shannon ARMSTRONG ("Venado") because he would return it. I believe that GOMEZ stated that he put some of the poor quality drug ("it has a little bit of the ugly one") for ARMSTRONG but that it looked good and that one unit of ARMSTRONG's drugs were ready. I believe that GOMEZ confirmed that MARTINEZ-CARRANZA would arrive later ("the other guy is coming here later?"). I believe that VALDEZ TORRES told GOMEZ to take some with him and not leave it all at the stash location ("leave some out") so that GOMEZ would be ready when ROGERS (Yonk) and WARD (Flaco) called for a supply of drugs. I believe that VALDEZ TORRES asked GOMEZ to let him know how much money (drug proceeds) GOMEZ had at the stash location ("check if there is insurance and send me a little message"). I believe that GOMEZ advised VALDEZ TORRES that he had $80,000.00 ("avenue number 8") just from one of their distributors, Jason ROGERS ("Yonke").

**Identification of Leonel VALDEZ AYON**

227.    On June 17, 2015, Kern County Sheriff Office Detectives established surveillance at 220 Castro Avenue, Delano, California. At approximately 4:47PM, Detective Hernandez observed a red Toyota Camry back out of the garage and depart the area. At approximately 5:10PM, Detective Hernandez and Detective Wonderly observed the Toyota Camry, bearing California license plate #6MAY632 (registered to Narciso Fernandez Martinez) arrive at the Arco gas Station located on Cecil Avenue in Delano, California. Detectives Hernandez and Wonderly observed that the driver of the vehicle was a Hispanic male, approximately 20-25 years old, 5'6" tall, 170 pounds with short/shaved brown hair. Detectives Hernandez and Wonderly positively identified the Hispanic male as Leonel VALDEZ AYON from California DMV photograph Y2556114.

**Probable Cause that VALDEZ AYON is the User of Telephone Number (661) 927-8566**

228.    On June 16, 2015, KCSO Detectives Wonderly and Hernandez observed a Hispanic male adult (later determined to be Leonel VALDEZ AYON), a Hispanic female adult, and a small child exiting the residence located at 135 Calle Pinuelas, Delano, California. Detectives observed VALDEZ AYON walking to the trunk of a red Toyota Camry (CA#6MAY632), carrying a box. At approximately 4:07PM, Detective Wonderly placed an outgoing call to (661) 927-8566 (Subscriber: Jenni Lopez). At the same time, SA Trent O'Neill observed VALDEZ AYON reach into

68

his pants pocket, take out a cellular phone, and place it to his ear. Detective Wonderly heard a male answer the phone in Spanish, "Bueno" and heard a small child in the background. A few moments later, VALDEZ AYON, the female, and child departed the residence in the red Camry. Detective Wonderly observed the red Camry drive around the block and arrive at 220 Avenue Castro. Detective Wonderly observed VALDEZ AYON park the vehicle inside the garage. Detective Wonderly observed VALDEZ AYON walk to the trunk of the vehicle. At the same time, at approximately 4:10PM, Detective Wonderly placed an outgoing call to (661) 927-8566. Detective Wonderly observed VALDEZ AYON remove an object from his pocket and look at the object, but VADLEZ AYON did not answer the phone.

**Probable Cause to Search 220 Avenue Castro, Delano, California (Stash House)**

229.   A review of video surveillance of the residence located at 220 Avenue Castro, Delano, California, indicated that the grey mini-van remained parked in front of 220 Avenue Castro, Delano, from the time it arrived at 2:03AM on June 14, 2015, until approximately 5:50PM on June 15, 2015. At approximately 5:50PM, SA Zavala observed an unidentified Hispanic male adult (UM1), wearing dark clothing, enter the grey van and depart the area.

230.   Based on intercepted conversations and surveillance, I believe that VALDEZ AYON (UM1) drove the grey minivan to 2335 Venice Drive to prepare the van for MARTINEZ-CARRANZA, who would be utilizing the van to transport a supply of drugs to Sacramento. I believe that VALDEZ AYON then picked up MARTINEZ-CARRANZA and returned to VALDEZ AYON's residence at 220 Avenue Castro. I believe that MARTINEZ-CARRANZA then departed 220 Avenue Castro in the grey minivan.

231.   At approximately 7:02PM, VALDEZ TORRES received an incoming call from MARTINEZ-CARRANZA. MARTINEZ-CARRANZA indicated that he was on his way to Sacramento when he said "I've been driving for two hours already."  Based on my training, experience, and knowledge of this investigation, I believe that during this telephone call MARTINEZ-CARRANZA was on his way to Sacramento with a supply of drugs (part or all of which MARTINEZ-CARRANZA obtained on June 13, 2015 from GAVILAN in Hesperia) at the time of this conversation. I believe that MARTINEZ-CARRANZA was traveling to Sacramento to meet with Roberto GOMEZ to deliver the supply of drugs.

69

232.    At approximately 7:09PM, VALDEZ TORRES received an incoming call from VALDEZ AYON, who indicated to VALDEZ TORRES that MARTINEZ-CARRANZA left with the supply of drugs when he said, "the man already [stutters] the car".

233.    At approximately 10:26PM, VALDEZ TORRES received an incoming call from GOMEZ. VALDEZ TORRES and GOMEZ engaged in the following conversations:

| VALDEZ TORRES | [Unintelligible] |
|---------------|------------------|
| GOMEZ | Listen. |
| VALDEZ TORRES | [Unintelligible] |
| GOMEZ | Um, I was going to tell you that the guy called already. Not the one nearby, the other one from over there. |
| VALDEZ TORRES | The... |
| GOMEZ | The one that is coming this way.  The [stutters] - [Voices overlap]. |
| VALDEZ TORRES | Oh yeah, what did he say? |
| GOMEZ | He wants [unintelligible/audio glitch]. |
| VALDEZ TORRES | I don't understand, my relative, you got cut off. |
| GOMEZ | The, the truck.  Do you want me to give him the red one? Or should I not give it to him yet or do - [voices overlap]. |
| VALDEZ TORRES | Ah. |
| GOMEZ | I keep that, that one here? |
| VALDEZ TORRES | No, not, not yet because he still has to make a trip to whoever needs the other one, for now, for today. |
| GOMEZ | Okay.  That is good.  That's fine because... What was I going to tell you?  I don't know if it is okay with you, well if you want I [stutters] for next time I can go by, but just down there where you are, I don't want to make a long trip all the way down there.  Just there with you if that's |

70

| | okay. What do you think? |
|---|---|
| VALDEZ TORRES | Yes, that is fine. It is fine, old man. You just let me know and it's done – [voices overlap]. |
| GOMEZ | Yes, yes. Okay. I was going to tell you if you want I can keep the little red one and I'll just go down to the little ranch there with you. |
| VALDEZ TORRES | Okay that is fine. That is fine. Okay. I think it's okay. |
| GOMEZ | I was going to tell you that I'm about to send you the little message about the insurance. |
| VALDEZ TORRES | Okay, that's fine. Just leave, leave - what [stutters] belongs to the guy outside. The twelve hundred and leave a hundred for the hotel and nineteen for the guy aside. Everything else - |
| GOMEZ | Nineteen. |
| VALDEZ TORRES | Yes, nineteen. |
| GOMEZ | Nineteen. Okay, that is fine. Nineteen. Okay. |
| VALDEZ TORRES | Nineteen for the guy you'll see in the morning. |
| GOMEZ | Okay, that is fine. |
| VALDEZ TORRES | Yes. You do know how much is nineteen, right? Almost two - |
| GOMEZ | Huh? |
| VALDEZ TORRES | Do you know how much is nineteen? Almost two burros just like you put them. |
| GOMEZ | Okay. That's fine. |
| VALDEZ TORRES | All right [stutters] then. |
| GOMEZ | All right. |

71

| VALDEZ TORRES | Send me the little message. |
| GOMEZ | Okay. |
| VALDEZ TORRES | And the, and what [stutters] you make there in the morning, put them there, there to the guy for in the morning. |
| GOMEZ | Okay.  That is fine.  Well right now, um, uh [stutters0 – what's Yonke's um, it, the … right now the message I'm going to send you that's for everything that is, and looking at the one right now that's everything. |
| VALDEZ TORRES | Okay, that is fine.  There is no problem. |
| GOMEZ | Okay. |
| VALDEZ TORRES | Just what's for the morning give a call so that you can put what, the other ones.  And then you – put them there like at five or whatever time you want. |
| GOMEZ | Okay then. |
| VALDEZ TORRES | Okay then. |

234.    Based on my training, experience, knowledge of the investigation, and related interceptions in this case, I believe that at the beginning of the conversation VALDEZ TORRES and GOMEZ discussed a separate drug transaction in which GOMEZ was to receive a supply of heroin and transfer $19,000 to an unknown individual. Later in the conversation, I believe that GOMEZ stated that he was going to send VALDEZ TORRES a text message stating the amount of drug proceeds ("insurance") that GOMEZ had on hand. I further believe that VALDEZ TORRES instructed GOMEZ to leave $1,200, $100, and $19,000 aside and to package up the remaining amount of drug proceeds. I believe that the $1,200 was payment to MARTINEZ-CARRANZA for delivering the drugs to GOMEZ and $100 was payment for MARTINEZ-CARRANZA's hotel room. I believe that the $19,000 were drug proceeds for the other individual that would deliver a supply of drugs. I believe that GOMEZ would package up the remaining amount of drug

72

proceeds for MARTINEZ-CARRANZA to transport back to Delano. I believe that VALDEZ TORRES told GOMEZ that whatever amount of money GOMEZ collected from distributors the following morning, to include it with the money that MARTINEZ-CARRANZA would transport ("there to the guy for in the morning").

235.     Between approximately 10:29PM on June 15, 2015 and 12:53AM on June 16, 2015, VALDEZ TORRES engaged in a series of text messages with MARTINEZ-CARRANZA in which I believe – based on my training, experience, and knowledge of this investigation – that MARTINEZ-CARRANZA informed VALDEZ TORRES that he had almost arrived in Sacramento when stating "I'm almost there". I believe that MARTINEZ-CARRANZA advised VALDEZ TORRES that he had contacted GOMEZ ("I called my compa already") to let GOMEZ know that he would arrive soon. I believe that MARTINEZ-CARRANZA then informed VALDEZ TORRES that he had met with GOMEZ when he said, "It is done". Based on the intercepted telephone conversations and surveillance, I believe that MARTINEZ-CARRANZA arrived in Sacramento with a supply of drugs. I believe that GOMEZ met with MARTINEZ-CARRANZA and paid for a hotel room for MARTINEZ-CARRANZA at the La Qunita Inn on Madison Avenue in Sacramento.

236.     On June 16, 2015, at approximately 8:23AM, agents established surveillance at the La Quinta Inn at 4604 Madison Avenue, Sacramento, California. SA Zavala observed a dark grey 2004 Chrysler minivan, bearing California license plate #6JSM020, parked at the hotel. The Chrysler minivan matched the description of the grey minivan observed via video surveillance on June 15, 2015 at the residences located at 220 Avenue Castro and 2335 Venice Drive in Delano, California.   The grey minivan was registered to Carlos J. Valdez at 6430 Verner Avenue, Apt 252, Sacramento, California.

237.     On June 16, 2015, at approximately 11:33AM, VALDEZ TORRES received an incoming call from GOMEZ. GOMEZ asked VALDEZ TORRES how many "burritos" VALDEZ TORRES ordered. VALDEZ TORRES said that he told the guy eight burritos for the group of people and one for Yonke. GOMEZ confirmed that there were eight burritos and one for Yonke. VALDEZ TORRES told GOMEZ to let him know.

238.     Based on my training, experience, and knowledge of this investigation, I believe that GOMEZ asked VALDEZ TORRES how many units of drugs MARTINEZ-CARRANZA delivered

73

to GOMEZ. I believe that VALDEZ TORRES advised GOMEZ that there were "8 burritos" (possibly 8 pounds of methamphetamine) and "one" (possibly one kilogram of heroin). I believe that the "8 burritos for the group of people" is 8 pounds of methamphetamine because the majority of VALDEZ TORRES' distributors obtain methamphetamine. I believe that the "one for Yonke" is heroin because Jason ROGERS, a.k.a., "Yonke", is VALDEZ TORRES' main distributor for heroin.

### Agents Positively Identify MARTINEZ-CARRANZA

239.    At approximately 11:40AM, on June 16, 2015, SA Montserrat observed a white 1996 Ford pickup truck, bearing California license plate #90485R1, arrive at the La Quinta Hotel and park adjacent to the grey Chrysler minivan. At approximately 11:43AM, SA Zavala observed a heavyset Hispanic male, wearing a grey polo shirt and dark jeans walk from the second floor of the La Quinta Hotel, down the stairs, and to the driver's side of the white Ford pickup. SA Zavala positively identified the heavyset male as Leobardo MARTINEZ-CARRANZA from California driver's license F8629985.

240.    At approximately 11:45AM, SA Zavala observed Roberto GOMEZ exit the white Ford pickup truck. SA Zavala observed GOMEZ remove a few items from the Ford pickup. SA Zavala observed GOMEZ enter the grey Chrysler minivan while MARTINEZ-CARRANZA and an unidentified male entered the white Ford pickup. Moments before MARTINEZ-CARRANZA entered the Ford pickup, SA Bersamina placed an outgoing telephone call to (661) 792-8425 (Subscriber: Salene Valdez) from an undercover telephone. At the same time, SA Zavala observed MARTINEZ-CARRANZA place a phone to his face while entering the front driver's seat of the Ford pickup. Agents observed GOMEZ depart the hotel in the grey Chrysler minvan at approximately 11:46AM. Agents observed MARTINEZ-CARRANZA and the unidentified male depart the hotel in the white Ford pickup at approximately 11:47AM. Based on my training, experience, and knowledge of this investigation, I believe that GOMEZ took possession of the grey minivan from MARTINEZ-CARRANZA because the supply of drugs was inside the grey minivan.

**GOMEZ Prepares Drugs for Sacramento Sub-Distributors at the 9190 Tuolumne Drive Stash House**

241.     At approximately 12:22PM, SA Bersamina observed GOMEZ arrive at and park the grey Chrysler minivan in the parking lot of a market located at the corner of Folsom Blvd and La Riviera Drive in Sacramento, California. Moments later, SA Bersamina observed GOMEZ exit the market, enter the minivan, and depart the parking lot. SA Bersamina observed GOMEZ drive to the Butterfly Garden Apartments located at 9190 Tuolumne Drive, Sacramento, and park the minivan in the parking area. At approximately 12:26PM, SA Bersamina observed GOMEZ exit the grey minivan and walk towards apartment #29. Based on my knowledge of the investigation, training, experience, and previously intercepted communications, I believe that GOMEZ brought the supply of drugs to a residence utilized to store drugs and money in order to weigh, package, and store the drugs.

242.     At approximately 12:42PM, VALDEZ TORRES received an incoming call from GOMEZ. GOMEZ stated that he was checking all of Venado's and all of them were short. GOMEZ stated that all eight of them were short and one of them was almost missing the same amount as "Arbolon". VALDEZ TORRES said that his relative made it but there was no problem to check what was missing and VALDEZ TORRES would talk with his relative later. VALDEZ TORRES told GOMEZ to check it real good and to add a dollar to the calculator just in case it was wrong. GOMEZ told VALDEZ TORRES that he had another calculator and that he checked each one on both calculators and they are all short.

243.     Based on my training, experience, and knowledge of this investigation, I believe that during the foregoing conversation GOMEZ indicated that he received the supply of drugs and was weighing and packaging the drugs at the stash location, located at 9190 Tuolumne Drive #29, Sacramento, California. I believe that GOMEZ advised VALDEZ TORRES that all eight units (believed to be 8 pounds of methamphetamine) weighed less than a pound ("were short"). I believe that GOMEZ stated that one pound was missing almost 1 ounce when stating that it was missing the same amount as "Arbolon". Based on my training and experience and familiarity with this investigation, I believe that VALDEZ TORRES and GOMEZ refer to a customer who purchases 1 ounce of methamphetamine on a frequent and consistent basis as "Arbolon". Therefore, VALDEZ TORRES and GOMEZ frequently just refer to "arbolon" as an

75

amount of drugs equal to "one ounce of methamphetamine" so as to avoid detection by law enforcement. I believe that VALDEZ TORRES told GOMEZ that the drugs were supplied by VALDEZ TORRES' relative and that VALDEZ TORRES would talk with the relative. I believe that VALDEZ TORRES told GOMEZ to double-check the weights and to weigh the drugs on a different scale when referring to another "calculator".

244.    At approximately 2:28PM, VALDEZ TORRES received an incoming call GOMEZ. During the conversation, GOMEZ told VALDEZ TORRES that he checked and six were fine. GOMEZ said that the seventh one was almost all "kiko" and that to get to the eight, they were short, three eighty seven and a half. GOMEZ told VALDEZ TORRES that he was trying to complete the eight but that it was all just big pieces. VALDEZ TORRES told GOMEZ that was fine. GOMEZ said that he wanted VALDEZ TORRES to know that 6 were fine, one was short, and the other was how he told him. GOMEZ said that he was going to check the one for the "Yonkiada" and would let VALDEZ TORRES know. VALDEZ TORRES asked GOMEZ if GOMEZ received the call they were expecting. GOMEZ said that they called yesterday to say they would call today.

245.    Based on my training, experience, and knowledge of this investigation, I believe that GOMEZ re-weighed the 8 pounds of methamphetamine and advised VALDEZ TORRES that 6 pounds of methamphetamine were the right weight but that one pound of methamphetamine was just slightly less than a pound ("short") and the eighth pound was short approximately 66 grams. I believe that GOMEZ described the methamphetamine when referring to "big pieces". I believe that GOMEZ then told VALDEZ TORRES that he was going to check and weigh the heroin ("the one for the Yonkiada") and let VALDEZ TORRES know.

**Use of Red Ford Minivan to Traffic Narcotics**

246.    On June 8, 2015, MARTINEZ-CARRANZA delivered a supply of drugs to GOMEZ in Sacramento, in almost identical fashion to the transaction that took place on June 16, 2015, as described above. Intercepted conversations indicated that MARTINEZ-CARRANZA would travel to Sacramento on the evening of June 7, 2015 to transfer a supply of drugs to GOMEZ. Intercepted telephone conversations indicated that GOMEZ met MARTINEZ-CARRANZA at the

hotel on the evening of June 7, 2015 to pay for the hotel room and take possession of the vehicle MARTINEZ-CARRANZA drove, containing the supply of drugs.

247.    On June 8, 2015, SA Montserrat established surveillance at the La Quinta Inn Hotel located at 4604 Madison Avenue, Sacramento, California.  At approximately 9:30AM, GOMEZ's white Ford pickup (CA#09485R1) parked at the La Quinta Inn.  At approximately 10:11AM, a red Ford minivan, bearing California license plate #4HGG160 (registered to Carlos J. Valdez), arrived and parked next to the white Ford pickup.  At approximately 10:13AM, the driver of the red minivan, GOMEZ, met and spoke with a Hispanic male, wearing a red shirt and a dark-colored ball cap and who was subsequently identified as MARTINEZ-CARRANZA.  At approximately 10:10PM, GOMEZ departed the hotel in the white Ford pickup.  Based on intercepted conversations and surveillance, I believe that MARTINEZ-CARRANZA utilized the red Ford minivan (CA#4HGG160) to transport a supply of drugs to Sacramento.  I believe that GOMEZ took possession of the van on the evening of June 7, 2015, and subsequently transferred the supply of drugs to a stash location.  I believe that GOMEZ then returned the van, possibly containing a large sum of drug proceeds, back to GOMEZ at the La Quinta Hotel on the morning of June 8, 2015.  I believe that MARTINEZ-CARRANZA then returned to Delano, California with the drug proceeds on the evening of June 8, 2015.


### TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING AND TRAFFICKERS

248.    As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions.  Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators. These records may be kept on paper or contained in memory calculators or computers.  It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control.  It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live. *See also United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986).  It is also my training and

experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time. *See also United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991).

249.     Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them. Typically traffickers keep records of those registrations and transactions in their residence.

250.     I have learned that large-scale drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business.  It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

251.     In my experience, traffickers commonly have in their possession, that is, on their person, at their residence and in the areas under their control, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons.  Such firearms are used by drug violators to protect their illicit drug trafficking operations, and themselves against law enforcement and other drug violators because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug

78

proceeds. Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers and quantities of currency.

252.    In my experience, traffickers commonly have in their possession, that is on their person, at their residences, and their vehicles, and in the areas under their control and which they have free and ready access to, drugs, including but not limited to in this case, methamphetamine and heroin, which they intend to distribute. It is my experience that these drug traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

253.    In my experience, drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

254.    In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

255.    In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities. It has also been my experience that traffickers will also utilize vehicles as locations in which to store controlled substances prior to distribution.   During prior investigations, I have observed that drug traffickers will often utilize vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

256.    In addition, these traffickers tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" the proceeds derived from the distribution of controlled substances.

257.    In establishing these entities, the traffickers often must travel to meetings in foreign countries as well as domestically. As a result of that travel, records are generated reflecting travel by commercial and private aircraft, Commercial Ocean and private vessels as well as common carrier(s).

258.    Individuals involved in the distribution of methamphetamine and heroin, and other illegal drugs, often make, or cause to be made, pictures, videos, movies, compact discs, floppy discs, or other such items which are or contain photographic or digital images in order to memorialize their methamphetamine and marijuana distribution, use, possession, or any other activities surrounding their methamphetamine and marijuana trafficking activities, and that such items often identify co-conspirators in their methamphetamine and/or heroin trafficking activities.

259.    It has been my experience in the past, and particularly in this case, that when suspects utilize mobile telephones to communicate to set up drug deals, records relating to these activities will be found stored in the cellular telephone. And, as relevant to this case, the drug traffickers in this case have made extensive use of text messaging to communicate about ongoing drug trafficking.

260.    I know that narcotics traffickers – including the conspirators in this case – use mobile telephones to communicate with one another, either by voice or text message. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking

because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

261.    As described above and in **Attachment A-1** to **A-12**, this Affidavit seeks permission to search and seize things that are related to the ongoing methamphetamine and heroin trafficking conspiracy involving the Target Subjects in whatever form such things are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

262.    It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in **Attachment B-1** and **B-2** are items most often associated with the distribution of controlled substances, including methamphetamine and heroin, as well as the proceeds from such illegal operations.

263.    The facts set forth in this Affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents and detectives who have participated in this investigation, and from reviewing official reports, documents, and

other evidence obtained as a result of this investigation.  This Affidavit is not an exhaustive enumeration of the facts that I have learned during the course of this investigation but, instead, are facts that I believe support a finding of probable cause to search the requested locations.

264.    Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in **Attachment B-1** and **B-2**.  Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.  Therefore, I am requesting authority to seize all the items listed in **Attachment B-1** and **B-2** to this Affidavit and incorporated here by reference.

## CONCLUSION AND ORDERS SOUGHTS

265.    Based upon the information set forth above, your affiant submits that there is probable cause to believe that the locations listed in **Attachment A-1** through **Attachment A-12** to this Affidavit contain evidence of a crime; contraband; fruits of a crime; and other items illegally possessed, property designed for use, intended for use, or used in committing a crime – specifically, the crime of (1) conspiracy to distribute and possess with in intent to distribute controlled substances, to wit, at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, and a mixture or substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21 United States Code Sections 846 & 841(a)(1); and (2) use of a communications facility in furtherance of a drug trafficking offense, namely conspiracy to distribute and possess with intent to distribute controlled substances, to wit, at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, and a mixture or substance containing a detectable amount of heroin, a Schedule I Controlled Substance, as charged herein, in violation of Title 21, United States Code, Section 843(b), committed by the following Target Subjects, and I further believe that probable

82

cause exists to charge each of the following subjects by the requested Criminal Complaint with the above-referenced crimes:

    i. **Jose Manuel VALDEZ TORRES**, a.k.a. "RUBEN;"

    ii. **Roberto GOMEZ, Jr.**, a.k.a., "Tito", "Beto;"

    iii. **Leonel VALDEZ AYON**, a.k.a. "LEON";

    iv. **Leobardo MARTINEZ-CARRANZA**, a.k.a., "Wacho", "Wachon";

    v. **Edgar Eduardo HERRERA;**

    vi. **Enrique Alonso VALDEZ YANEZ;**

    vii. **Jason Duane ROGERS**, a.k.a., "Yonk/Yonki/Yonke;"

    viii. **Shannon Anthony ARMSTRONG**, a.k.a., "Venado/Benado;"

    ix. **Bradley Gene WARD**, a.k.a., "Flaco;"

    x. **David Andrews UHRIG**, a.k.a., "Casa," "Casa de Piedra;"

    xi. **William James WELCH**, a.k.a., "Burlington;" and

    xii. **Michael William McGIBBON**, a.k.a., "Banquita."

266.    Further, I specifically request authority to search the following locations for the items listed in **Attachment B-1:**

    i. **2335 Venice Drive, Delano, California** (stash house for the VALDEZ TORRES DTO);

    ii. **9190 Tuolume Drive #29, Sacramento, California** (stash house for the VALDEZ TORRES DTO);

    iii. **220 Avenue Castro, Delano, California** (stash house for the VALDEZ TORRES DTO);

    iv. **4400 Shandwick Drive #237, Antelope, California** (stash house for the VALDEZ TORRES DTO);

v. **337 Liberty Lane, Delano, California** (the California residence of VALDEZ TORRES);[9]

vi. **6040 Parkoaks Drive, Citrus Heights, California** (the residence of Jason ROGERS);

vii. **555 Encina Drive, El Dorado Hills, California** (the residence of Shannon Anthony ARMSTRONG);

viii. **6041 Hilltop Drive, Carmichael, California** (the residence of Bradley Gene WARD);

ix. **6742 Kenneth Avenue, Orangevale, California** (the residence of David Andrews UHRIG);

x. **7203 Grady Drive, Citrus Heights, California** (the residence of William James WELCH);

xi. **7019 Glass Slipper Way, Citrus Heights, California** (the residence of Michael William McGIBBON); and

xii. All vehicles over which any owner, occupant, or resident of the premises has dominion and control, as determined by agent's observation of such person operating or accessing vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person, specifically including, but not limited to:

1. A 2004 grey Chrysler minivan, California license plate CA#6JSM020 registered to Carlos J. Valdez, 6430 Verner Ave, Apt 252, Sacramento, CA (driven by GOMEZ to traffic narcotics);

2. A 1996 white Ford Ranger pickup truck, California license plate CA# 09485R1, registered to Carlos Javier Valdez, 2536 Traction Avenue, Apt 3, Sacramento, CA (driven by GOMEZ and an unidentified male known as MARTIN to traffic narcotics);

3. A 2008 dark grey Dodge Durango, California license plate CA#6BAC754, registered to Maria Gonzalez or Arturo

---

[9] As to 337 Liberty Lane, Delano, California (the California residence of VALDEZ TORRES), the undersigned is seeking a search warrant to search for the items described in **Attachment B-2**.

Gonzalez, 6455 Villa Drive, Sacramento, CA (driven by GOMEZ to traffic narcotics); and

4. A 1990 red Ford minivan, California license plate CA#4HGG160, registered to Carlos J. Valdez, 2536 Traction Ave, Apt 3, Sacramento, CA (driven by GOMEZ and MARTINEZ-CARRANZA to traffic narcotics).

I declare under the penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed on this 24th day of June 2015 by:

Cindy Yamasaki, Special Agent
Drug Enforcement Administration


Sworn to and subscribed before me
this 24 day of June, 2015

HONORABLE KENDALL J. NEWMAN
United States Magistrate Judge


Approved as to Form:

Christiaan H. Highsmith
Assistant U.S. Attorney

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br><br>1999 FORD MINIVAN, CALIFORNIA LICNSE PLATE NO.<br>4HGG160, | )<br>)<br>)<br>)<br>)<br>) |

2: 1 5 - SW - 0 3 5 5  **KJN**

Case No.

# SEALED

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the          Eastern          District of          California *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B-1, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before    July 8, 2015    *(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for          days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of

Date and time issued:    June 24, 2015    12:55 A m.

City and state:          Sacramento, California

_____
Judge's signature

Kendall J. Newman, U.S. Magistrate Judge
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

Subscribed, sworn to, and returned before me this date.

_____          _____
Signature of Judge                                          Date

**Attachment A**

**Vehicle to be Searched**

A 1999 red-colored Ford minivan with California license plate #4HGG160, registered to
Carlos J. Valdez, 2536 Traction Ave, Apt 3, Sacramento, California; utilized by members
of the VALDEZ TORRES DTO, including Roberto GOMEZ, Jr. and Leobardo MARTINEZ-
CARRANZA, to transport drugs and drug proceeds and to conduct drug transactions

## ATTACHMENT B-1

## Items to be Seized

1.      Methamphetamine, heroin, or any other controlled substance, including paraphernalia, and documentation associated with the sales and transportation of each drug, including hypodermic needles, hypodermic syringes, eye droppers, spoons, cotton, scales and other weighing devices, balloons, condoms, paper bindles, tin foil bindles, plastic or cellophane bindles, razor blades, knives, blenders;

2.      United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used in this investigation;

3.      Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4.      Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

5.      Cellular telephones and other communication devices which may contain evidence of participation in a conspiracy to distribute controlled substances (however, no search of the memory of such device shall be allowed absent obtaining a warrant authorizing such a search);

6.      Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7.      Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.      Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

9.      Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.      Handguns, shotguns, rifles, ammunition and other firearms possessed in relation to drug trafficking or discovered in the possession of a prohibited person; and

11.      Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records

Attachment B